**DENTSPLY INTERNATIONAL, INC. and Dentsply Research and Development Corp., Plaintiffs,**

v.

**KERR MANUFACTURING COMPANY, Defendant.**

**No. Civ.A. 89–167–JJF.**

United States District Court, D. Delaware.

March 11, 1999.

Order Denying Reargument and/or Reconsideration April 29, 1999.

Richard D. Kirk, of Morris James Hitchens & Williams, Wilmington, Delaware, Dianne B. Elderkin, Lynn Malinoski, Albert W. of Woodcock Washburn Kurtz Mackiewicz & Norris, Philadelphia, Pennsylvania, James B. Bieber, of Denstply International, Inc., York, Pennsylvania, for plaintiffs.

Robert Jacobs, of Jacobs & Crumplar, Wilmington, Delaware, Arthur T. Fattibene, Paul A. Fattibene, of Fattibene and Fattibene, Southport, Connecticut, for Centrix, Inc.

## OPINION

FARNAN, Chief Judge.

## TABLE OF CONTENTS

INTRODUCTION ................................................... 388

BACKGROUND ..................................................... 389

I. Procedural Background of Dentsply v. Kerr, Civil Action No. 89–167 ...... 389

II. Procedural Background of Centrix v. Dentsply, Civil Action No. 89–507 ... 389

III. Factual Background For The Instant Contempt Proceedings ............ 390

ISSUES PRESENTED TO THE COURT .................................. 392

DISCUSSION ..................................................... 393

I. Whether Centrix Is Bound By the Injunction Directed At Kerr ........... 393

 A. Federal Rule of Civil Procedure 65(d) and the Law of Privity .......... 393

 B. The Parties' Contentions ......................................... 394

 C. Findings of Fact and Conclusions of Law........................... 394

 1. Contractual Evidence ....................................... 394

2. Centrix's Rule in the Dentsply Litigation ........................ 396

3. Centrix's Knowledge of the Injunction ......................... 399

II. **Whether Contempt Proceedings Are Appropriate** ...................... 400

A. *Legal Standard* .............................................. 400

B. *The Parties' Contentions* ....................................... 400

C. *Findings of Fact and Conclusions of Law* ......................... 401

1. Comparison of NuGun device to Kerr device ..................... 401

2. Comparison of the Vivadent device to the Kerr device ............. 402

3. Conclusion ................................................ 403

III. **Whether Centrix Violated the Injunction** ............................ 403

A. *The Law of Infringement* ....................................... 403

B. *Claim Construction* ............................................ 405

1. Whether an Undercut Groove must have a Rearward Wall ........ 405

2. Whether the Compartment must be Cylindrical in Shape .......... 405

3. Whether the Lever Means must be Connected to the Barrel ....... 406

C. *Infringement Analysis* .......................................... 406

1. Whether the Combination of the NuGun ejector holder and Either the Accudose or Aelitefil Cartridges meets every element of Claim 1 of the '280 Patent ......................................... 406

2. Whether the NuGun ejector holder meets every element of Claim 1 of the '853 Patent ......................................... 410

3. Whether the combination of the Centrix-Manufactured Vivadent ejector holder and the Vivadent Cartridges meets every element of Claim 1 of the '280 Patent ..................................... 413

4. Whether the Centrix-Manufactured Vivadent ejector holder meets every element of Claim 1 of the '853 Patent ..................... 415

IV. **Whether Dentsply Is Issue Precluded From Asserting Infringement of the '280 and '853 Patents Against Centrix** .............................. 417

**CONCLUSION** ........................................................ 418

## INTRODUCTION

Presently before the Court is the issue of whether Centrix, Inc. ("Centrix") should be held in contempt for violating an injunction issued by the Court on January 27, 1993, in connection with a lawsuit brought by Dentsply International Inc. and Dentsply Research and Development Corporation (jointly "Dentsply") against Kerr Manufacturing Corporation ("Kerr") for the infringement of two patents related to devices used by dentists for delivering dental composite filling material to patients' teeth. Seeking to hold Centrix in

contempt for its manufacture and sale of the NuGun and Vivadent devices, Dentsply filed a Motion For Order To Show Cause Why Centrix, Inc. Should Not Be Held In Contempt Of This Court's Injunction (D.I. 303) alleging, among other things, that Centrix should be bound by the injunction because it was in privity with Kerr at key times during the aforementioned lawsuit. Finding sufficient support for Dentsply's assertion of privity, the Court granted the Motion and held an evidentiary hearing. For the reasons set forth below, the Court concludes that Centrix should be held in contempt for violating this Court's injunction dated January 27, 1993.

## BACKGROUND

In determining whether Centrix should be held in contempt for violating this Court's January 27, 1993 injunction, the Court finds that a brief description of the instant case and a related pending case provides useful context and background for the issues raised by this contempt proceeding. Following a description of the procedural posture of these actions, the Court will present the factual background for this contempt proceeding.

### I. Procedural Background of *Dentsply v. Kerr,* Civil Action No. 89–167

In April 1989, Dentsply initiated a lawsuit against Kerr Manufacturing Corporation ("Kerr") for patent infringement (the "*Dentsply* litigation") (Civil Action No. 89–167). The patents in issue related to capsule-like cartridges containing dental composite filling material and ejector holders used by dentists to express the composite materials from the cartridge to patients' teeth. Among other things, Dentsply alleged that Kerr's sale of UNIDOSE cartridges and ejector holders infringed three Dentsply Patents: U.S. Patents Nos. 4,330,280 (the "'280 Patent"), 4,384,853 (the "'853 Patent"), and 4,391,590 (the "'590 Patent").

A jury trial was held in June 1990 and a verdict was returned in favor of Dentsply. Specifically, the jury concluded that Dentsply's three patents were valid, enforceable, and infringed by the Kerr UNIDOSE cartridges and ejector holders. On October 10, 1991, the Court entered Final Judgment in accordance with the jury's verdict. After a number of unsuccessful post-trial motions filed by Kerr, the Court granted Dentsply's motion for injunctive relief. On January 27, 1993, the Court entered a Final Order and Judgment, which incorporated the Court's Final Judgment Order of October 10, 1991, and permanently enjoined "Kerr, its officers, agents, employees and licensees ... from continuing to manufacture or have manufactured for, use or sell the Kerr Unidosel tip (first version) and/or syringes which have been found to infringe Claims 1 and 2 of the '590 patent, Claims 1, 3, 4, 6, 7, 9, 10, 11 and 12 of the '280 patent, and Claims 1, 2, and 4 of the '853 patent." (D.I.265).

More than two years following the issuance of the injunction, Dentsply filed its show cause motion, spawning the instant contempt proceedings.

### II. Procedural Background of *Centrix v. Dentsply,* Civil Action No. 89–507

Though not named as a party in the *Dentsply* litigation, discovery in the Dentsply litigation revealed that Centrix, the entity named in the instant contempt motion, manufactured the accused UNIDOSE cartridges and ejector holders for Kerr. Approximately five months after Dentsply initiated suit against Kerr, Centrix filed a separate action against Dentsply (the "*Centrix* litigation").[1] (Civil Action No. 89–507–JJF). In this action, Centrix asserts claims of unfair competition, patent misuse, tortious interference with contract, and infringement of a Centrix patent and restates as affirmative causes of action, the counterclaims that had been raised by Kerr in the *Dentsply* litigation, namely that Dentsply's patents were not valid, not

1. Dr. William B. Dragan is also named as a plaintiff in Civil Action No. 89–507.

enforceable and not infringed by the Centrix-manufactured UNIDOSE cartridges and ejector holders. Dentsply counterclaimed for infringement of the '280, '853 and '590 patents. The *Centrix* and *Dentsply* actions were consolidated for the purposes of discovery only.

Following the jury verdict in the *Dentsply* litigation, Dentsply filed a motion in the *Centrix* litigation seeking a preliminary injunction against Centrix under the '280, '853 and '590 patents. On July 15, 1992, the Court denied the motion based on the finding that Dentsply had not met its burden of showing irreparable harm. On August 31, 1992, the Court ordered the *Centrix* action administratively closed until such time as either party requested further relief. Following a request from Centrix, the stay was lifted on December 6, 1996.[2] Since the lifting of the stay, the parties have filed numerous motions in that action, some of which turn on the outcome of the instant contempt proceedings.

## III. Factual Background For The Instant Contempt Proceedings

On December 14, 1988, prior to the Dentsply and Centrix litigations, Centrix and Kerr entered into a contractual relationship under which Centrix agreed to manufacture and sell to Kerr particular capsules filled with material to be supplied by Kerr (the "1988 Supply Agreement"). This agreement contained the following indemnification provision:

CENTRIX shall defend KERR, at Centrix' [sic] expense, against any claim, action or other proceedings ("all hereinafter the Action") brought against Kerr for patent infringement with regard to the use or sale of the Products, even if the allegations in the Action are groundless, false or fraudulent. In addition, CENTRIX shall indemnify KERR for

any and all liability, damages, judgments incurred by KERR as a result of any such patent infringement Action.

(PX–92 at ¶ 9).

Over a year later, in April 1989, Kerr was sued by Dentsply for patent infringement. According to the testimony of Stephen Tomassi, General Counsel of Cybron International, the parent company of Kerr, Centrix initially declined to honor the indemnification and defense provision in the 1988 Supply Agreement. To prevent a default judgment from being taken, Kerr retained counsel and began to defend the lawsuit. Meanwhile, negotiations between Centrix and Kerr continued. (Tr. of 12/20/96 Hearing ("Tr.") at 6:14–8:24).

Approximately one year later, in March 1990, the negotiations between Kerr and Centrix culminated in the Indemnification and Defense Agreement (the "1990 Indemnification Agreement"). (Tr. 8:25–9:7). Unlike the general indemnification and defense clause in the 1988 Supply Agreement, the 1990 Indemnification Agreement specifically referred to the *Dentsply* litigation. In pertinent part, the 1990 Indemnification Agreement provided:

Centrix shall, at its expense, defend Kerr against all the allegations made by Dentsply in that action filed in the United States District Court for the District of Delaware, entitled Dentsply International and Dentsply Research and Development Corporation v. Kerr manufacturing Company, Case Number 89–167, (hereinafter the "Action"). It is understood that the allegations made by Dentsply against Kerr in the action include but are not limited to the following: trademark infringement with respect to the UNIDOSE Capsule; trademark infringement with respect to the use by Kerr of the word "Compules"; unfair competition by Kerr's use of Dentsply's color dress

---

**2.** Though not pertinent to the instant proceedings, the Court notes for completeness, that on December 30, 1996, the Court consolidated Civil Action 89–507 with another case, Civil Action 96–257, which involves the same parties, but was transferred *sua sponte* from the United States District Court for the District of Connecticut to this Court.

capsule shape, trademark and the word "Compules"; patent infringement with respect to the 590 patent and patent infringement with respect to the 853 patent. (PX–113 at ¶ 1). In addition, under the terms of this agreement, the 1988 Supply Agreement was to be terminated on March 31, 1990, and a new supply agreement was to be executed to take effect as of April 1, 1990. (PX–113 at ¶ 5).

According to Mr. Tomassi, subsequent to the execution of this agreement, Centrix retained the firm of Lerner, David, Littenberg, Krumholz & Mentlik ("Lerner David") to succeed the firms Kerr had retained to represent Kerr during the trial. (Tr. 11:–12:10). It is at this point, that Dentsply maintains, and Tomassi supports, that Centrix took control of Kerr's defense in the Dentsply litigation. According to Tomassi, Kerr was not consulted with regard to the retention of the Lerner David firm, and Centrix paid all of the Lerner David firm's fees until November 1992. In addition, Tomassi stated that Centrix made all the decisions regarding which defenses would be presented, and that neither Centrix, nor the Lerner David firm, ever asked him for his input. According to Tomassi, he was never given regular reports concerning the progress of the trial, and only kept apprised of the litigation through his own efforts to ask questions or observe portions of the trial. (Tr. 11:24–14:5).

Although Centrix denies that it controlled the substance of the lawsuit, through the testimony of Dr. William Dragan, Centrix admits that it paid for all of Kerr's attorney fees between March 1990 and June 1992. (Tr. 79:5–7). With regard to Centrix's role in the litigation, Dr. Dragan testified that Centrix suggested possible strategies to Kerr and its attorneys, but Kerr refused to take Centrix's advice. (Tr. 65:7–15, 75:7–9). Dr. Dragan also stated that Centrix did not have any contact with the Lerner David law firm because they were "Kerr's attorneys." (Tr. 75:9). Dr. Dragan did, however, admit that he attended the trial daily. (Tr. 66:10).

Aside from the discrepancy regarding whether Kerr or Centrix substantively controlled the lawsuit, the parties agree that during the course of the June 1990 trial in the *Dentsply* litigation, Centrix and Kerr executed another agreement entitled Clarification to Indemnification and Defense Agreement (the "Clarification Agreement"). According to the testimony of Mr. Tomassi, this agreement was spawned by his concern that Centrix might not indemnify Kerr against any judgment obtained by Dentsply in that case, because Kerr had not yet entered into the supply agreement contemplated by the March 1990 Indemnification Agreement. (Tr. 14:9–22). This agreement reaffirmed both Kerr's obligation to enter into a supply agreement and Centrix's obligation to indemnify and defend Kerr as set forth in the March 1990 Indemnification Agreement. However, in affirming Centrix's indemnification and defense responsibilities, the Clarification Agreement recognized that the "new supply agreement may or may not be executed prior to the conclusion of the trial in the Dentsply action." (PX–628 at ¶ 2).

On June 27, 1990, the jury returned a verdict in favor of Dentsply and post-trial motions followed. Although Kerr still had not entered into the supply agreement contemplated by the March 1990 Indemnification Agreement and the Clarification Agreement, Centrix admits that it continued to pay Kerr's attorneys' fees through this period of post-trial filings. (Tr. 79:5–7). However, on February 14, 1991, Melvin Drumm, President of Centrix, sent a letter to Brian Brenner, President of Kerr, informing him that unless Kerr executed the supply agreement by March 15, 1991, Centrix would consider Kerr to be in breach of the 1990 Indemnification Agreement and would seek reimbursement for all fees and expenses Centrix paid for Kerr's defense. (C–51A).

Shortly thereafter, Kerr entered into a supply agreement with Centrix. Though signed in March 1991, this agreement was made retroactively effective as of April 1, 1990. (the "1991 Supply Agreement") (C–52). Like many of the other agreements, the 1991 Supply Agreement also contained an indemnification provision. (C–52 at ¶ 10). The first paragraph of this provision, set forth Centrix's obligations to defend and indemnify Kerr for the sale of the capsules specified in the 1991 Supply Agreement. (C–52 at ¶ 10a). The second paragraph, however, explicitly referred to the *Dentsply* litigation and stated:

The above paragraph shall not in any way limit Centrix's obligation to indemnify KERR with regard to any expenses, costs or damages incurred by KERR in the Dentsply International, Inc., et al. v. Kerr Manufacturing Company, et al. litigation, C.A. NO. 89–167–JJF, filed in the United States District of Delaware. The indemnification obligations of CENTRIX for the Dentsply litigation shall be determined by the Indemnification and Defense Agreement entered into by CENTRIX and KERR on March 6, 1990.

(C–52 at ¶ 10b).

Though the record is not explicit, business relations apparently continued between Kerr and Centrix until June 1992. According to Dr. Dragan, in June 1992, Kerr apparently refused to pay Centrix for an invoice of capsules under the 1991 Supply Agreement. Discussions and disagreements between the parties followed.

On July 8, 1992, in the *Dentsply* litigation, the Court ruled that Dentsply was entitled to injunctive relief. Thereafter, Centrix and Kerr were still unable to resolve their contract dispute. Finally, in November 1992 Centrix officially repudiated the 1990 Indemnification Agreement. (Tr. 79:12–17, 81:15–17).

At the time of the repudiation, Tomassi testified that Kerr resumed control of the *Dentsply* litigation. (Tr. 16:2–17:5). At this point, the only issues remaining in the *Dentsply* litigation were a decision as to whether the judgment against Kerr should be appealed, some motions on accounting issues, and Dentsply's request for enhanced damages. (Tr. 17:2–5). Debate over these litigation matters progressed, and on January 27, 1993, the Court entered an injunction against Kerr. Finally, on September 29, 1995, after resolution of the above described litigation matters, the *Dentsply* litigation was closed.

A few months later, Kerr satisfied the judgment rendered against it in the *Dentsply* litigation by paying Dentsply approximately $615,000 to $620,000. Although Tomassi contends that Centrix was obligated to indemnify Kerr for this judgment, Centrix never reimbursed Kerr. (Tr. 24:18–20). In fact, Kerr and Centrix eventually became embroiled in a breach of contract lawsuit in Michigan. (Tr. 19:8–11). However, there was never an adjudication of liability in this lawsuit, because the action was resolved by a settlement, in which Kerr paid Centrix $340,000. (Tr. 23:22–23).

Though seemingly concluded, the *Dentsply* litigation resumed when Dentsply filed its motion for an order to show cause directed at Centrix. The Court granted Plaintiff's Motion For An Order To Show Cause, the *Dentsply* action was reopened, and a hearing was held to determine whether Centrix should be held in contempt for violating the January 27, 1993 injunction. Post-hearing briefing was completed by both parties summarizing their contentions presented at the hearing.

## ISSUES PRESENTED TO THE COURT

Frequently, motions for contempt involve previously adjudged infringers who have allegedly modified their devices to avoid future infringement of a patent. However, this case presents a slightly different scenario. Here, the Court is not faced with a previously adjudged infringer, but with an entity who was not a party in

the original litigation that prompted the injunction. Thus, because Centrix is a nonparty, the Court must determine, as a threshold matter, whether Centrix may properly be bound by the injunction.

If this issue is resolved in the affirmative, then the Court must turn its attention to the remaining issues which are ordinarily raised by a motion for contempt for violation of an order enjoining patent infringement. Specifically, these issues are: (1) whether contempt proceedings are appropriate, and, if so, (2) whether the injunction has, in fact, been violated. *KSM Fastening Systems v. H.A. Jones Co.,* 776 F.2d 1522, 1532 (Fed.Cir.1985). This Memorandum Opinion encompasses the Court's findings of fact and conclusions of law regarding the issues raised by the parties in the instant contempt proceedings.

## DISCUSSION

### I Whether Centrix Is Bound By The Injunction Directed At Kerr

#### A. *Federal Rule of Civil Procedure 65(d) and the Law of Privity*

In pertinent part, Federal Rule of Civil Procedure 65(d) provides that an order granting an injunction "is binding upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). Under the literal terms of this rule, it would appear that Centrix should not be bound by the injunction issued against Kerr, because Centrix was neither a party to the *Dentsply* litigation, nor an officer, agent, servant, employee, or attorney of Kerr. However, a proper interpretation of Rule 65(d), requires the Court to go beyond the literal language of the rule and examine

the origins of the rule and the manner in which this rule has been applied.

■ Historically, Rule 65(d) is derived from the common law principles that a person not named in a decree of injunction could be held in contempt for violation of that order in two circumstances: (1) if the unnamed person was legally identified with the named defendant, or (2) if the unnamed person aided or abetted the named person in performing enjoined acts.[3] *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 179, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945); *Alemite Manufacturing Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir.1930). In light of its common law origins, courts have rejected a narrow reading of the rule that would limit persons "legally identified with" a party to the persons specifically recited in the rule. Instead, courts have concluded that an injunction properly binds, not only the named parties, but also those identified with them in interest, in privity with them, represented by them, or subject to their control. *Golden State Bottling,* 414 U.S. at 179, 94 S.Ct. 414; *G & C Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 36 (1st Cir.1980).

■ In attempting to establish privity in this case, Dentsply relies on the "virtual representative" concept of privity. Under this notion of privity, a "non-party may be bound if a party is so closely aligned with its interests as to be its 'virtual representative.'" *Symbol Technologies v. Metrologic Instruments,* 771 F.Supp. 1390, 1399 (D.N.J.1991) (citations omitted). Virtual representation occurs where there is an " 'express or implied legal relationship between the named party to the first action and the non-party sought to be bound.'" *Id.* at 1399–1400. Thus, a virtual relationship may be found where the nonparty exercised "control over and interest in the earlier litigation." *United States v. Web-*

---

**3.** Because no allegations of aiding or abetting have been raised, this case turns on whether Centrix, the unnamed entity, was legally identified with Kerr, the entity that was a party in the lawsuit and expressly named in the injunction.

*ber,* 396 F.2d 381, 387 (3d Cir.1968). Generally, the extent of control and interest in the earlier litigation necessary to bind a nonparty to an injunction may be expressed in terms of a finding that the nonparty was legally identified with the named defendant, such that the nonparty could be said to have had its day in court with respect to the validity of the injunction. *G & C Merriam Co.,* 639 F.2d at 37.

### B. *The Parties' Contentions*

In support of its position that Centrix is in privity with Kerr and should be bound by the injunction issued against Kerr, Dentsply raises three arguments. First, Dentsply contends that Centrix was contractually obligated to defend and indemnify Kerr in patent infringement lawsuits. Second, Dentsply contends that Centrix financially and substantively controlled Kerr's defense by paying Kerr's attorneys' fees, making decisions about which defenses should be presented, conducting settlement discussions with Dentsply, without Kerr's advice or involvement, and presenting facts during trial that would not have been known to Kerr without Centrix's involvement. Third, Dentsply argues that Centrix had actual knowledge of the injunction, and as such, should be bound by it.

On the other hand, it is Centrix's position that it has not yet had its day in court, and as such, should not be bound by the Court's injunction. In response to Dentsply's arguments, Centrix argues that it was not obligated to indemnify or defend Kerr, because Kerr breached the agreement that formed the basis for Centrix's duty to indemnify or defend Kerr. Moreover, Centrix contends that Kerr maintained control over all aspects of its own defense and that any involvement Centrix may have had in the lawsuit resulted from the Court's decision to consolidate the *Dentsply* and *Centrix* lawsuits for the purpose of discovery. Lastly, Centrix argues that it did not have actual notice of the

injunction and thus, should not be bound by it.

### C. *Findings of Fact and Conclusions of Law*

█ Based on the evidence and testimony adduced at the hearing, the Court concludes that Centrix is bound by the Court's January 1993 injunction, because Centrix was Kerr's "virtual representative" in the *Dentsply* litigation. As explained below in detail, the Court's conclusion of privity is based on the contracts between Kerr and Centrix, the factual account of Centrix's role in the litigation as presented by Mr. Tomassi, and Centrix's actual notice of the injunction.

#### 1. Contractual Evidence

The contractual evidence in this case supports the Court's finding that Centrix controlled Kerr's defense in the *Dentsply* litigation. That Centrix was to defend and indemnify Kerr was stated initially in the 1988 Supply Agreement and was reiterated three times in subsequent agreements, which the Court finds both strengthened and clarified Centrix's role in the *Dentsply* litigation. (PX–92, PX–113, PX–628, C–52). Unlike the 1988 Supply Agreement which contained a general indemnification and defense provision, the 1990 Indemnification Agreement, explicitly stated that Centrix was to defend and indemnify Kerr in the *Dentsply* litigation. The specific indemnity obligations set forth in the 1990 Indemnification Agreement were reaffirmed by the Clarification Agreement and the 1991 Supply Agreement, which explicitly referenced the 1990 Indemnification Agreement as the controlling document for determining Centrix's defense and indemnity obligations. (C–52 at ¶ 10b).

In an attempt to nullify the impact of the 1990 Indemnification Agreement, Centrix contends that it was not contractually obligated to defend Kerr, because Kerr breached the 1990 Indemnification Agreement by failing to enter into a new supply agreement by April 1990. However, Cen-

trix did not repudiate the contract in April 1990. Rather, in June 1990 Centrix reaffirmed its obligations under the 1990 Agreement by entering into the Clarification Agreement. Under the terms of the Clarification Agreement, the validity and enforceability of the Indemnification Agreement was still predicated upon Kerr's entering into a new supply agreement; however, it was also "understood that the new supply agreement may or may not be executed prior to the conclusion of the trial in the Dentsply action." (PX–628). As such, the Court finds that the terms of the Clarification Agreement effectively waived Kerr's noncompliance with the April 1990 date and maintained the effectiveness of the 1990 Indemnification Agreement through the conclusion of the *Dentsply* trial, provided that Kerr eventually enter into a new supply agreement.

Although Centrix did not repudiate the Indemnification Agreement in 1990, Centrix contends that it clearly asserted its belief that Kerr breached the Indemnification Agreement in a letter dated February 14, 1991. However, the Court finds Centrix's position regarding this letter to be an overstatement of its content. While the letter indicates that Centrix threatened to consider Kerr in breach of the 1990 Agreement and to seek repayment of the attorney's fees and expenses Centrix incurred in the defense of Kerr, the letter does not state that Centrix *actually* considered Kerr to be in breach. Rather, the letter informed Kerr that, only if it did not consummate a new supply agreement by March 15, 1991, would Centrix consider Kerr to be in breach of the Indemnification Agreement. The letter explicitly stated that "this breach can be avoided by executing the new agreement by March 15, 1991." (C–51A). As such, the Court finds that this letter is not indicative of Kerr's breach, but rather, that the letter extended Kerr's time for compliance with the March 1990 Indemnification Agreement.

In compliance with Centrix's letter, Kerr eventually enter into the required supply agreement. (C–52). Like the Clarification Agreement, the 1991 Supply Agreement also confirmed Centrix's obligations to defend and indemnify Kerr with respect to the *Dentsply* Litigation. (C–52). Moreover, this agreement was made retroactive to April 1, 1990. Given this evidence, the Court is unpersuaded by Centrix's argument that Kerr breached the 1990 Agreement by failing to execute the supply agreement in April 1990.

Although Centrix's duty to defend and indemnify Kerr for the *Dentsply* litigation was confirmed in multiple agreements, Centrix argues a second basis for Kerr's breach of the 1990 Indemnification Agreement. Specifically, Centrix argues that the Court should disregard the 1990 Indemnification Agreement and the subsequent agreements reiterating its effect, because Kerr eventually breached the 1991 Supply Agreement by failing to purchase the required product for the five year term specified in the agreement. In connection with this argument, Centrix highlights Tomassi's testimony that Kerr paid Centrix $340,000 to settle the breach of contract action between Centrix and Kerr.

However, the Court finds Centrix's arguments regarding Kerr's breach of the 1991 Supply Agreement to be unpersuasive on the privity issue. First, the Court refuses to construe Kerr's decision to settle the contract action as an admission of liability for breach. Second, despite any alleged breach, Centrix's Dr. Dragan admits that Centrix did not repudiate the March 1990 Agreement until November 1992, well after conclusion of the *Dentsply* trial and several months after the alleged disagreement over the 1991 Supply Agreement. (Tr. 79, 81, 82). Moreover, irrespective of whether Kerr breached the 1991 Supply Agreement and whether this breach relieved Centrix of its contractual obligation to defend and indemnify Kerr under the 1990 Indemnification Agreement, the Court finds that during the peri-

od from March 1990 to November 1992, Centrix did, as a factual matter, defend Kerr to the extent necessary to support the conclusion of privity between Centrix and Kerr.[4]

### 2. Centrix's Role in the *Dentsply* Litigation

In addition to the documentary evidence considered in reaching this conclusion, the Court has also considered the testimony of Stephen Tomassi and Dr. William Dragan. In evaluating the accounts of the interaction between Kerr and Centrix during the Dentsply litigation, the Court credits the testimony of Stephen Tomassi regarding Centrix's role in the *Dentsply* litigation.

During his testimony, Tomassi candidly admitted that Kerr controlled its litigation prior to the 1990 Indemnification Agreement and subsequent to Centrix's November 1992 repudiation of that agreement. (Tr. 8:18–24, 16:2–7, 18:24–19:1). However, Tomassi steadfastly maintained that from March 1990 to November 1992, Kerr relinquished its control over the litigation. (Tr. 12:14–13:23, 38:2–19, 39:11–40:14, 42:6–17). During this time frame, which included the bulk of discovery, the trial, and a number of post-trial motions, Tomassi unequivocally asserts that Centrix controlled the litigation, pursuant to the terms of the March 1990 Indemnification Agreement.

In an attempt to discredit Tomassi's testimony and support its position that Kerr controlled the Dentsply litigation, Centrix highlights two portions of Tomassi's affidavit. (PX–630). First, Centrix argues that Tomassi admitted that he represented Kerr since the filing of the lawsuit. However, in the paragraph in which this statement appears, Tomassi also explains that Centrix had an indemnity agreement with Kerr and that Centrix was not honoring

the indemnity, "so Kerr has been handling the defense on its own." (PX–630). Further, Tomassi's affidavit is consistent with his testimony at the hearing. During the hearing, Tomassi explained that, while Kerr initially controlled the lawsuit and resumed control in November 1992, during the period from March 1990 to November 1992, Centrix controlled the litigation. (Tr. 8:18–24, 12:14–13:23, 16:2–7, 18:24–19:1, 38:2–19, 39:11–40:14, 42:6–17). Therefore, taken in context, the Court finds Centrix's argument unpersuasive.

In addition, Centrix argues that Tomassi's statement, that the litigation was becoming a drain on Kerr's resources, is evidence that Kerr controlled the lawsuit. Reviewing the context for this statement, however, the Court must again reject the implication Centrix seeks to draw from it. First, the affidavit itself, reveals that this statement referred to Kerr's position prior to the trial and described Kerr's incentive for attempting to settle the *Dentsply* litigation. (PX–630). Second, Tomassi's unshaken testimony during cross-examination clarified that this statement did, in fact, refer to the period *before* the March 1990 Indemnification Agreement was entered into and *before* Centrix took control of Kerr's defense. (Tr. 42:1–8).

Tomassi's testimony that Centrix assumed control of Kerr's defense following the execution of the March 1990 Indemnification Agreement is further supported by the corresponding fact that, just after this agreement was entered into, new trial counsel, the Lerner David law firm, made an appearance and replaced the previous law firms retained by Kerr. (Tr. 11:20–25, 12:1–10, 79:1–4). In an attempt to minimize Centrix's role in the litigation, Centrix suggests that Kerr retained the law firm of Lerner David. However, in light

---

**4.** For clarification, the Court notes that it is not rendering a decision on any breach of contract issues, as those issues are not presently before the Court. Rather, the Court is viewing the contracts as they relate to the issue of privity. Therefore, the essence of the

Court's ruling is that even if Centrix was ultimately relieved of its legal duty to defend and indemnify Kerr, as a factual matter, Centrix did defend Kerr for approximately two years, in a manner which was consistent with the terms of the various agreements.

of Tomassi unswayed testimony on this issue, the Court simply cannot accept Centrix's argument. Both on direct and cross examination, Mr. Tomassi emphatically affirmed that Centrix, not Kerr, retained the Lerner David law firm, and that Centrix, not Kerr, would be responsible for paying all the invoices from that firm. (Tr. 12:24–25, 13:1–5, 39:11–17, 40:10–14). Indeed, that Centrix paid for all fees charged by the Lerner David law firm from March 1990 to November 1992, was confirmed by Centrix's Dr. Dragan. (Tr. 79:5–7).

In addition to its financial control over the lawsuit, Centrix's substantive control over Kerr's defense in the *Dentsply* litigation is also evidenced by Tomassi's unequivocal testimony on that issue. Tomassi strenuously asserted that Centrix's statements, that it acted only as an observer during the Dentsply litigation and that Kerr acted independently of Centrix at all times, were untrue. (Tr. 17:14–21, 19:4–7). Tomassi further testified that Centrix's Dr. Dragan made numerous decisions concerning which defenses to assert on behalf of Kerr and that Centrix conducted settlement negotiations with Dentsply without Kerr's involvement. (Tr. 38:6–14, 42:6–8). Indeed, even Dr. Dragan, who denies that Centrix controlled Kerr's defense, admits that Centrix did more than merely observe the trial and that Centrix made "suggestions" regarding beneficial strategies to the lawsuit. (Tr. 64:24–25, 65:1–2).

Moreover, Tomassi's testimony regarding the extent of Centrix's participation in the lawsuit is supported by the record of the *Dentsply* litigation. During the *Dentsply* trial, three of the witnesses appearing on behalf of Kerr's defense were prominent Centrix figures: Dr. Dragan, the founder and Chairman of the Board of Centrix (D.I. 305, Trial Transcript ("TTr.") A147–A224), John Discko, the executive Vice President of Centrix (TTr.A225–A241) and Arthur Fattibene, Secretary of Centrix and Centrix's outside counsel. In addition, many topics raised during the trial were predicated upon facts that were entirely within Centrix's knowledge and control. For example, during trial, the defense was presented that Dr. Dragan should have been named as a co-inventor of the '590 Patent. (TTr.A259–A263). According to Mr. Tomassi, he neither recommended this defense, nor was he aware of the underlying factual basis for it. (Tr. 13:17–23, 14:1–5).

Similarly, during the trial, a number of Centrix's witnesses testified about information which was unique to them individually or to Centrix. For instance, Centrix's Dr. Dragan testified about correspondence and meetings between Centrix and Dentsply (TTr.A171–A178, A181–A189), his development of the accused Kerr devices (TTr.A193–A197), non-infringement opinions he received relating to the Dentsply patents (TTr.A197–A199, A206–A207), facts relating to dentists' practices bearing on the issue of likelihood of confusion (TTr.A218–A222), and licensing and reasonably royalty rates in the dental field. (TTr.A189–A190, A223–A224). Likewise, Centrix's Discko testified about a number of meetings between Centrix and Dentsply in which Kerr was not involved (TTr.A226–A241), and Centrix's . Fattibene testified about noninfringement opinions rendered by him to Centrix. (TTr.A249–A252). Given the nature of much of this information, the Court finds that it is unlikely that it would have been known to Kerr, absent Centrix's significant involvement.

In further opposition to Dentsply's contention that Centrix's controlled Kerr's defense, Centrix argues that its interests in the *Dentsply* litigation were different from Kerr's interests. Specifically, Centrix argues that its primary focus was invalidating Dentsply's patents, and that Kerr's primary interest was in negating Dentsply's trademark and trade dress claims. In support of this position, Centrix relies on *TRW Inc. v. Ellipse Corp.*, for the proposition that "privity in the law of judicial finality usually connotes representation." 495 F.2d 314, 318 (7th Cir.1974). In reviewing the *TRW* decision, the Court

concludes that the analysis of *TRW* actually belies Centrix's position that it was not in privity with Kerr.

In *TRW*, the Court of Appeals for the Seventh Circuit refused to apply the doctrine of res judicata to TRW, a nonparty, who agreed to indemnify a named party in a prior suit, but whose role in the prior suit was limited to observing the proceedings and filing amicus curiae briefs. In reaching this conclusion, the court noted that the crucial distinction between *TRW* and other cases, in which nonparty indemnitors were found to have interests sufficiently close for establishing privity for res judicata purposes, was TRW's limited extent of participation in the prior lawsuit. Indeed, the court explicitly distinguished TRW's situation from the situation in which a nonparty indemnitor retained the indemnitee-defendant's counsel and controlled the litigation.

In this case, Centrix's role in the prior litigation was much more extensive than simply observing the litigation and filing amicus curiae briefs. Given the Court's findings based on Tomassi's testimony regarding the extent of Centrix's participation, the Court finds that Centrix's role in this litigation is more akin to the latter situation distinguished by the *TRW* court. Thus, *TRW* supports the Court's conclusion that, as a nonparty indemnitor who retained counsel and controlled the litigation, Centrix is in privity with Kerr and properly bound by the injunction.

In connection with its argument that Centrix and Kerr's interests in the litigation were diverse, Centrix also argues that Centrix and Kerr's relationship deteriorated to the point of becoming adversarial. In support of this argument, Centrix relies on *Symbol Technologies*. 771 F.Supp. at 1400.

In *Symbol Technologies*, the court examined the concept of virtual representation for purposes of privity and concluded that no virtual relationship existed between the nonparty, Metrologic, and the named party, Opticon, where Metrologic was "in competition with Opticon and had its own independent and individual agenda for its continued survival and hopeful prosperity." *Id.* at 1401. However, a closer reading of the case suggests that the competitive relationship between Metrologic and Opticon was not the primary reason for the court's conclusion that no virtual relationship existed between Metrologic and Opticon. Rather, the court explicitly noted the absence of an agreement by Metrologic to indemnify or defend Opticon in any form from a patent infringement suit and the absence of any form of contractual relationship between the Metrologic and Opticon. *Id.* According to the court, had such an agreement or contractual relationship existed, then Metrologic's situation would have mirrored the situation presented in *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961). Discussing *Schnell,* the *Symbol Technologies* court described the situation in *Schnell* as an example of the type of virtual relationship that would permit a third party to be bound by a previous ruling. *Symbol Technologies,* 771 F.Supp. at 1400.

In *Schnell,* the manufacturer agreed to defend and pay all expenses incurred in infringement suits filed against the purchaser involving the patented device, pursuant to the terms specified in their contract of sale.[5] *Schnell,* 365 U.S. at 261, 81 S.Ct. at 559. Commenting upon *Schnell,* the court in *Symbol Technologies* noted that "issue preclusion was proper in Schnell against the manufacturer where the manufacturer was called in to defend a prior suit against a purchaser where the purchaser was the named party." *Symbol Technologies,* 771 F.Supp. at 1400. In comparing the situation in *Schnell* to the situation presented by Metrologic, the

---

5. Like *TRW, Schnell* is a res judicata case, however, the Court finds the discussion of privity in these cases to be instructive for the purposes of the application of privity in this case.

*Symbol Technologies* court noted that "[u]nless the level of activity rises to that as found in *Schnell* . . . neither privity nor virtual representation can be found to have occurred." *Id.*

In this case, the Court finds that the situation between Centrix and Kerr more closely resembles the situation in *Schnell* than the situation in *Symbol Technologies*. While Centrix and Kerr may have been in competition at some point, may have had separate agendas and may have ended up as adversaries in a breach of contract action, Centrix and Kerr had a contractual relationship and pursuant to that relationship, Centrix actually defended Kerr from March 1990 to November 1992.[6] Thus, in accord with such cases as *Symbol Technologies* and *Schnell*, the Court concludes that the relationship between Centrix and Kerr exemplifies the type of virtual relationship necessary to establish privity.[7]

### 3. Centrix's Knowledge of the Injunction

In asserting that it is not bound by the injunction issued against Kerr, Centrix argues that it did not have notice of the injunction, because neither Kerr nor Dentsply ever served a copy of the injunction on Centrix prior to Dentsply's motion to show cause. However, Dentsply maintains that, although Centrix was not formally served with the injunction, Centrix had actual knowledge of the injunction.

During the hearing, Kerr's Mr. Tomassi testified that he spoke with Mr. Fattibene, Centrix's long-time counsel, on numerous occasions about the injunction. (Tr. 35:17–25, 36:2–22). That Mr. Fattibene and Centrix knew of the injunction is further evidenced by a set of requests for admissions which were propounded by Centrix and Dr. Dragan on Kerr in April 1993, in connection with the Michigan litigation. These requests for admission were served by Mr. Fattibene and contained the following request for admission: "Kerr has been permanently enjoined by the U.S. District Court for the District of Delaware from infringing U.S. Patents 4,330,280, 4,391,590 and 4,383,853." (PX–631). In addition, when confronted with this evidence, Dr. Dragan could not deny that Centrix had actual notice of the injunction, as early as April 1993. (Tr. 82:4–12). Given this evidence, the Court rejects Centrix argument that it had no notice of the injunction, and finds that, as early as April 1993, Centrix had actual knowledge of the injunction issued against Kerr.

Because of the contractual relationship between Centrix and Kerr, Centrix's extensive participation in the litigation and Centrix's knowledge of the injunction, the Court concludes that privity exists between Kerr and Centrix. Because privity exists between Centrix and Kerr, the Court further concludes that Centrix is bound by the injunction issued against Kerr in the *Dentsply* litigation. With this

---

6. Even Centrix's Dr. Dragan admits that Centrix did not repudiate the March 1990 Agreement to defend and indemnify Kerr until November 1992, which was well after completion of the trail, issuance of the jury verdict, and entry of final judgment. Thus, this admission is consistent with the Court's finding that Centrix had been actively defending Kerr, as had been contemplated by the agreements between Centrix and Kerr.

7. In the context of establishing Centrix's divergence and independence from Kerr, Centrix also relies on *Additive Controls & Measurement Systems, Inc. v. Flowdata*, for the proposition that a nonparty should not be enjoined or held in contempt for its independent conduct regarding the subject matter of a prior lawsuit. 96 F.3d 1390, 1394 (Fed.Cir. 1996). In *Flowdata*, the court held that it was improper for a district court to enter an injunction against a nonparty's conduct, independent of any complicity with the enjoined party. The court noted that this prohibition "stems from the basic principle that an injunction ordinarily cannot be imposed on a non-party that has not had the opportunity to contest its liability." *Id.* at 1397. Unlike the evidence in this case, however, there was no suggestion in *Flowdata* that the non-party participated in any way in litigating the prior case. Therefore, *Flowdata* is distinguishable from the case at bar.

threshold criteria satisfied, the Court will turn to the remaining issues of whether contempt proceedings are appropriate, and if so, whether Centrix violated the Court's injunction.

## II. Whether Contempt Proceedings Are Appropriate

### A. *Legal Standard*

■ To a large extent, the district court has discretion to determine whether infringement should be adjudicated in contempt proceedings. *KSM*, 776 F.2d at 1529. However, this discretion is not unlimited. The uniform view among the circuits is that "[P]roceedings by way of contempt should not go forward if there is more than a "colorable difference" in the accused and adjudged devices". *Id.* In determining whether a difference is "colorable" for the purposes of this inquiry, the Court of Appeals for the Federal Circuit employs a procedural test, rather than a substantive test. Under this test, which is the majority view, the original infringing product is compared with the accused device to determine whether substantial new issues need to be litigated to determine infringement. *Id.* at 1530; *see also Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1348 (Fed.Cir.1998). If substantial disputed issues exist, then there is a "fair ground for doubt" that the injunction has been violated, and contempt proceedings are inappropriate. *Id.* at 1532. On review, courts of appeals will defer to the judgment of the district court on the issue of whether a contempt proceeding is appropriate, provided that the district court exercises its discretion, with these constraints in mind.

### B. *The Parties' Contentions*

In arguing that the differences between the devices are merely colorable and insufficient to raise substantial disputed issues requiring full litigation, Dentsply has offered the testimony of Mr. Scales, a chemical engineer who is the Research and Developer Manager at the L.D. Caulk Division of Dentsply International. Comparing the NuGun and Vivadent devices to the Kerr device, Mr. Scales noted differences, which he described as "cosmetic." (Tr. 108:21, 117:24).

With regard to the NuGun device, Mr. Scales noted that the NuGun had thicker sidewalls than the Kerr device. In addition, the cartridge compartment of the NuGun was configured to have two portions of different diameter, while the compartment on the Kerr device has a single diameter. (Tr. 108:20–25). However, Mr. Scales testified that these differences did not change the essential nature of the NuGun device as compared to the Kerr device, and were irrelevant to the elements of the patents in issue. (Tr. 108:20–109:1–5).

With regard to the Vivadent device, Mr. Scales noted that there was a difference in the shape of the cutaway in the forward end of the barrel, as compared to the Kerr device. According to Mr. Scales, this difference exists because the Vivadent device accommodates a cartridge of a different dimension than the Kerr device. (Tr. 117:18–118:1). Like the differences in the NuGun device, Mr. Scales testified that the differences in the Vivadent device did not change the essential nature of the Vivadent device, as compared to the Kerr device.

In opposition to Dentsply's contention that the differences among the devices are merely colorable, Centrix contends that the differences are substantial.[8] With regard to the NuGun, Centrix specifically raises the following differences which it describes as substantial: (1) the NuGun does not have flexible sidewalls that extend toward one another a distance less

---

8. The arguments Centrix raises showing that the devices are substantially different are the same arguments Centrix raises against infringement. Accordingly, the Court will ex-

amine these issues in greater detail in the context of the patent claims, as is necessary for an infringement analysis, in Section III.C. *infra*.

than the diameter of the cartridge, and therefore the NuGun does not provide a snap-acting retaining means, and (2) the NuGun lacks an undercut groove. In addition, Centrix argues that the fact that a new patent issued on its NuGun construction evidences that the NuGun device is substantially different from the Kerr device.

With regard to the Vivadent device, Centrix contends that the Vivadent device is substantially different from the Kerr device, because: (1) the Vivadent device utilizes different cartridges than the Kerr device, and (2) only Vivadent cartridges may be used in the Vivadent device. In support of its assertions, Centrix offered the testimony of Dr. William Dragan, founder, Chairman · and Chief Executive Officer of Centrix.

### C. *Findings of Fact and Conclusions of Law*

1. Comparison of NuGun device to Kerr device

█ In comparing the accused NuGun device to the Kerr Unidose device, which was previously determined to infringe the patents in issue in this case, the Court concludes that the differences between the devices are merely colorable. While the devices are different in size and color, the Court concludes that these differences are insignificant in the context of infringement of the '280 and '853 Patents.

With regard to the thickness of the barrel of the NuGun and its compartment configuration, the Court credits the testimony of Mr. Scales, and finds, based on his testimony, that these differences are inconsequential to the essential nature of the NuGun device and to the elements of the patent, as compared to the Kerr device. Accordingly, for purposes of determining the propriety of contempt proceedings, the Court concludes that these differences do not raise substantial disputed issues requiring litigation.

In considering whether the specific issues raised by Centrix concerning the NuGun device are substantial disputed issues requiring full litigation, the Court finds an analogy to summary judgment to be helpful. Similar to the burdens borne by each party on summary judgment, Dentsply, as the movant in this case, must show that there are no substantial disputed issues of fact underlying a determination of infringement. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Stated another way, Dentsply must show an absence of evidence to support Centrix's case. As the non-movant, Centrix must proffer counter-evidence showing that there is a substantial disputed issue of fact requiring litigation.

Regarding the flexibility, distance of the sidewalls, and snap-fit issue, Dentsply offered empirical evidence from flexibility tests that Mr. Scales performed on the NuGun, as well as measurements of the NuGun device and its cartridges. According to Mr. Scales' tests and measurements, the NuGun's walls are flexible and do extend toward one another a distance less than the diameter of the cartridge, thereby providing a snap-fit for an inserted cartridge.

In opposition to Dentsply's evidence, Centrix's Dr. Dragan testified that the walls of the NuGun are inflexible, do not extend toward one another, and the inflexibility of the walls results in a "press-fit" retaining means, rather than a snap-fit retaining means. However, unlike Mr. Scales testimony, Dr. Dragan's testimony was not based on any measurements or tests. Further, Centrix did not offer any measurements or tests of its own contradicting the results of Mr. Scales. Accordingly, the Court rejects Dr. Dragan's testimony as conclusory argument. Like summary judgment proceedings, contempt proceedings are summary in nature. Therefore, like summary judgment proceedings, contempt proceedings require affirmative evidence, rather than mere ar-

gument, to create a substantial triable issue.[9] Accordingly, because Centrix's arguments concerning the flexibility and distance of the sidewalls of the NuGun are factually unsubstantiated, the Court concludes that Centrix has not raised new or open issues requiring additional litigation.

While Centrix did not offer affirmative evidence challenging Mr. Scales, Centrix urged the Court not to credit Mr. Scales' testimony. (D.I. 345 at 21–22). According to Centrix, Mr. Scales "cannot be considered as a well-qualified witness or expert." (D.I. 3347 at 8, n. 6). In light of the position which Centrix, through Kerr, took during the trial in Civil Action 89–167, the Court rejects Centrix's argument concerning Mr. Scales' credibility. At the trial, Centrix took the position that one of ordinary skill in the art would have a four year engineering degree and two to four years of additional experience in the field. (TTr.1496:14–21). This is precisely the education and experience possessed by Mr. Scales, and therefore, by Centrix's own definition, Mr. Scales is a qualified witness.[10]

█ With respect to Centrix's argument that the NuGun lacks an undercut groove, Centrix again relies on the conclusory testimony of Dr. Dragan. However, the Court finds that Dr. Dragan's testimony does not raise a substantial issue precluding summary proceedings, because his testimony concerning the undercut groove relates to claim construction. Any issue created by Dr. Dragan's testimony on the lack of an undercut groove in the NuGun device pertains to whether the NuGun device meets the "undercut groove" element recited in the claims of the patents. Issues of claim interpretation are matters of law exclusively for the Court, and there-

fore, issues of claim interpretation are insufficient to create a material issue of fact precluding summary adjudication of infringement. *See George v. Honda Motor Co.*, 802 F.2d 432, 434 (Fed.Cir.1986) (holding that dispute concerning legal issues of claim interpretation is insufficient to preclude summary judgment). Accordingly, the Court concludes that Centrix's undercut groove argument is insufficient to raise a substantial triable issue.

█ Lastly, to the extent that Centrix argues that the NuGun and Kerr devices are substantially different, because a new patent issued on the NuGun construction requiring inflexible sidewalls and other features, the Court rejects Centrix's argument. In the context of determining whether contempt proceedings are appropriate, it is not Centrix's new patent which must be compared with the adjudged infringing Kerr device, but rather, it is Centrix's NuGun device which must be compared with the Kerr device. *See KSM*, 776 F.2d at 1530 (requiring comparison of products for determination of whether contempt proceedings are appropriate). While Centrix may have intended to create a product with inflexible sidewalls, the unrebutted empirical evidence offered by Dentsply shows that the NuGun does not comport with Centrix's intentions. Therefore, the Court finds the issuance of a new patent irrelevant to determining the propriety of contempt proceedings.

### 2. Comparison of the Vivadent device to the Kerr device

Upon visually comparing the Vivadent device with the Kerr device, the Court finds that the devices are virtually identical. While the Court notes that there is a different shape cutaway in the Vivadent device, the Court credits the testimony of

---

**9.** *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that nonmovant must point to evidence to defeat summary judgment motion); *Glaverbel Societe Anonyme, Fosbel Inc. v. Northlake Mktg. & Supply*, 45 F.3d 1550,

1562 (Fed.Cir.1995) (holding that argument is not substitute for evidence to defeat summary judgment).

**10.** For further discussion regarding the credibility of Mr. Scales, see *infra* Section III.C.1.

Mr. Scales and finds that this difference is inconsequential to the nature of the device and the elements of the patent. As Mr. Scales testified, the difference in shape in the Vivadent device merely serves to accept a different cartridge than the Kerr device, and the type cartridge the device accepts is irrelevant to the nature of the device and the elements of the patents. Indeed, it is the Vivadent ejector holder and not the Vivadent cartridge that is accused of infringing the '280 and '853 Patents.[11]

To the extent that Centrix argues that the Vivadent device is substantially different from the Kerr device, because it accepts a different cartridge and operates only with a Vivadent cartridge, the Court rejects Centrix's argument. The '280 and '853 Patents neither call for a specific type of cartridge, nor require the interchangeability of cartridges, as Centrix's argument suggests. Therefore, as discussed above, the cartridge is irrelevant to this infringement action. Accordingly, the Court finds that the differences between the Vivadent device and the Kerr device are insufficient to raise substantial disputed issues.

### 3. Conclusion

In sum, the Court concludes, based on Mr. Scales' testimony and on the Court's visual inspection and utilization of the products, that a comparison between the NuGun device and the Kerr device, and the Vivadent device and the Kerr device, shows no more than "colorable" differences. Further, the Court concludes that Centrix has failed to offer evidence creating a substantial issue requiring litigation. Accordingly, the Court concludes that contempt proceedings are appropriate. With this established, the Court will proceed to the next inquiry, which is whether the accused NuGun and Vivadent devices infringe the claims of the patents in issue.

## III. Whether Centrix Violated The Injunction

With privity and the propriety of contempt proceedings established, the Court must determine whether Centrix violated the Court's January 1993 injunction, such that Centrix can be held in contempt. In adjudicating whether the injunction has been violated, the Court must determine whether the accused NuGun and Vivadent devices literally infringe Claim 1 of the '853 and '280 Patents, as Dentsply contends.

### A. *The Law of Infringement*

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent...." 35 U.S.C. § 271(a). In addition, whoever actively induces infringement of a patent or sells a material for use in practicing a patented process is liable as an infringer. 35 U.S.C. § 271(b), (c). However, before one can be held liable for inducing infringement by a third party, it must be shown that there is direct infringement of the patent by the third party. *Hodosh v. Block Drug Co., Inc.,* 833 F.2d 1575, 1578 (Fed.Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988).

Generally, in ascertaining whether a patent has been infringed, the patent owner has the burden of proof, and must meet its burden by a preponderance of the evidence standard. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988) (citations omitted). However, to show that a defendant is civilly liable for contempt, the patent owner bears a higher burden. To show contempt, the patent owner must prove by clear and convincing evidence that the accused device falls within the admitted or adjudicated scope of the claims, and is

---

**11.** While the Court acknowledges that the '280 and '853 Patents refer to the cartridges in the devices, the fact that the car-

tridges satisfy the patent criteria is not disputed.

therefore an infringement. *Pirkle v. Ogontz Controls Co.*, 39 U.S.P.Q.2d 1317, 1996 WL 146306 (E.D.Pa.1996).

A patent owner may prove infringement under either of two theories: literal infringement or the doctrine of equivalents. Under the theory of literal infringement, infringement occurs where each element of at least one claim of the patent is found in the alleged infringer's product. *Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 n. 1 (Fed.Cir. 1987); Robert L. Harmon, *Patents and the Federal Circuit* 195 & n. 31 (3d ed.1994). A claim in a patent can only be infringed if it reads on each and every element of the alleged infringer's product. *American Hoist & Derrick Co. v. Manitowoc Co., Inc.*, 603 F.2d 629, 630 (7th Cir.1979); *see also Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1484 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984) (infringement avoided only if element present in alleged infringing process absent in patented invention); *Hormone Research Found., Inc. v. Genentech*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991) (infringement only if each claim or equivalent found in accused invention). If a patent has a series of claims, and one claim is infringed, then the entire patent is infringed. *Panduit*, 836 F.2d at 1330 n. 1. Under the theory of the doctrine of equivalents, however, infringement may be established even where elements in the claimed invention are missing from the alleged infringer's product, if the "accused device performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed device." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Warner–Jenkinson Company, Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (declining to overrule *Graver Tank*); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325 (Fed.Cir.1991).

To find infringement under either theory, the Court must undertake a two-step process. First, it must interpret the claims at issue by evaluating the language of the claims ("claim interpretation"). *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 876 (Fed.Cir.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). Claim interpretation is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–978 (Fed.Cir. 1995), *aff'd*, 517 U.S. 370, 388–390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. *Markman*, 52 F.3d at 978. A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in construing the true meaning of the language used in the patent. *Id.* at 980 (citations omitted). A court should interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). However, if the patent inventor clearly supplies a different meaning, the claim should be interpreted accordingly. *Markman*, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. *In re Yamamoto*, 740 F.2d 1569, 1571 & n. * (Fed.Cir.1984) (citations omitted).

The second step to determine infringement requires a court to compare the accused products with the properly construed claims of the patent at issue to determine whether the accused products infringe on the patent under either the theory of literal infringement or under the theory of the doctrine of equivalents ("infringement analysis"). *Miles Lab.*, 997 F.2d at 876; *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed.Cir.1985).

## B. *Claim Construction*

In arguing that the NuGun and Vivadent devices do not infringe Claim 1 of the '280 and '853 Patents, Centrix raises three issues, which the Court concludes are questions of claim construction. The three issues raised by Centrix involve: (1) whether an undercut groove must have a rearward wall; (2) whether the compartment must be cylindrical in shape; and (3) whether the lever means must be attached to the barrel. Other than these issues, the Court finds that interpretation beyond the plain and ordinary meaning of the language of the claims is unnecessary.

### 1. Whether an "Undercut Groove" must have a Rearward Wall

▇▇▇ In relevant part, both the '280 and '853 Patents require:

... an undercut groove formed forward of said interior bore and rearwardly in said compartment within said sidewalls to receive the annular collar on said cartridge to prevent relative axial movement between said cartridge and compartment, ...

In arguing that the NuGun does not have an undercut groove, but rather a "shoulder" (Tr. 166:6–8), Centrix contends that a "groove" must have a rearward wall, a floor, and a front wall, akin to a tongue and groove used in carpentry (Tr. 166:10–14; D.I. 345 at 19, 35; D.I. 347 at 12). Further, Centrix contends that an "undercut groove" must stop movement of the cartridge not only in the forward direction, but also in the rearward direction. (Tr: 172:7–16).

The Court finds nothing in the '280 or '853 Patents supporting Centrix's claim construction requiring the undercut groove to have a "rearward" wall. Indeed, the Court finds that such a requirement would be contrary to the '280 Patent specification. According to the teachings of the patent specification, the cartridge may be inserted into the compartment of the ejector holder and then moved "axially for-

ward for disposition of the flange in an undercut seat." (PX–623 at col. 3, lns. 47–52). If, as Centrix suggests, the undercut groove was required to have a rearward wall, there would be no way to move the cartridge "axially forward" to engage the flange with the front wall of the groove. Rather, like the mating pieces in tongue and groove carpentry, the flange would have to be snapped into the groove. Further, the figures illustrated in the patents show an undercut groove that does not have a rearward wall. Thus, Centrix's interpretation of the phrase "undercut groove" as requiring a rearwall would exclude the preferred embodiment of the invention, as illustrated in the figures in the patents. As the Federal Circuit has recognized, " 'it is unlikely that an inventor would define an invention in a way that excluded the preferred embodiment'," and a claim interpretation that does so is "rarely, if ever, correct absent highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996).

In this case, the Court finds that Centrix has failed to produce highly persuasive evidence that its claim interpretation of an undercut groove requiring a rearward wall is correct. Indeed, Centrix's own evidence suggests the contrary. Centrix's own patent attorney submitted a declaration in opposition to Dentsply's Show Cause Motion opining that the NuGun device possessed the undercut groove element recited in Claim of 1 of the '280 and '853 Patents. (D.I. 314 at C90). Because Centrix's construction flies in the face of the preferred embodiment of the '280 and '853 Patents and lacks evidentiary support, the Court declines to accept Centrix's interpretation of the phrase "undercut groove."

### 2. Whether the Compartment must be Cylindrical in Shape

▇▇▇ In relevant part, both the '280 and '853 Patents provide

... and said other end of the barrel being cutaway longitudinally a limited

distance to provide a compartment having sidewalls extending a limited distance beyond the axis of said barrel . . .

With regard to the above-described compartment, Centrix suggests that the forward chamber must be cylindrical in cross-section, as opposed to horseshoe shaped. (D.I. 347 at 13). In reviewing the claim language of the '280 and '853 Patents, the Court finds nothing requiring the compartment to be cylindrical. Indeed, the preferred embodiment of the compartment, as shown in Figure 6 of the '280 and '853 Patents depicts a horseshoe shaped forward chamber. Because the Court finds that Centrix has not offered highly persuasive evidence that its contrary interpretation is correct, the Court declines to accept an interpretation which excludes the disclosed preferred embodiments. *See Vitronics*, 90 F.3d at 1583. Accordingly, the Court rejects Centrix's argument construing the patent to require a cylindrical compartment.

3. Whether the Lever Means must be Connected to the Barrel

■ In relevant part, the '280 Patent [12] requires a:

. . . manually operable lever means on one end of said barrel operable to reciprocate said plunger relative to the other end of said barrel . . .

Centrix contends that a proper interpretation of this claim language requires the lever to be connected to the barrel. In reviewing the claim language and the specification of the '280 Patent, the Court finds nothing requiring the lever to be physically connected to the barrel. Indeed, the language of the preferred embodiment describes the lever as being physically connected to the handle. In the words of the preferred embodiment, "Pivotally connected to the handle is an operating lever." With respect to the location of the barrel in relation to the lever, the preferred embodiment states, "The upper end of operat-

ing lever is offset laterally to facilitate operation of the lever with respect to the outer end of plunger which terminates in a button engageable by the inner surface of the operating lever." Thus, the Court construes this claim as requiring the lever to be positioned on one side of the barrel, but not physically connected to the barrel. Because Centrix's construction is at odds with the preferred embodiment of the patent, the Court declines to accept Centrix's construction of the lever means.

### C. Infringement Analysis

■ With Centrix's claim construction issues resolved, the Court will turn its attention to Dentsply's claim that the Nu-Gun and Vivadent devices literally infringe Claim 1 of the '280 and '853 Patents. In order to determine whether the accused products literally infringe on the patent, the Court will compare the language of the claims in issue with the accused products.

1. Whether the combination of the Nu-Gun ejector holders and either the Accudose or Aelitefil Cartridges meets every element of Claim 1 of the '280 Patent

After comparing the language of Claim 1 of the '280 Patent with the combinations of the NuGun ejector holder and either the Centrix Accudose or the Aelitefil cartridges with which it is to be used, the Court finds that Dentsply has established by clear and convincing evidence that all of the elements of Claim 1 of the '280 Patent are present in the accused combinations.

**A manually operable ejector holder**

The Court finds that the NuGun is a manually operable ejector holder. (Tr. 91:6–8; PX 625, ¶ 6). Centrix does not dispute this. (Tr. 164:7–10). Accordingly, the Court finds that this element is present in the NuGun device.

---

12. The '853 Patent does not include this language, and therefore Centrix's argument con-

cerning the appropriate construction of the lever means only applies to the '280 Patent.

**and a loaded capsule-like cartridge**

The Court finds that the NuGun ejector holders are intended for use with loaded capsule-like cartridges, specifically the Centrix Accudose cartridges or the Aelitefil cartridges. The Aelitefil cartridges are sold loaded with a composite, viscous material, while the Centrix cartridges are sold unloaded and later filled by the dentist with a viscous material. (Tr. 91:9–19; PX 625, ¶ 6). Centrix does not dispute this. (Tr. 164:11–13). Accordingly, the Court finds that this element is present in the NuGun device.

**in which said cartridge has an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between**

The Court finds that both the Aelitefil and the Centrix Accudose cartridges have an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between. Centrix does not dispute this. (Tr. 164:14–17). Accordingly, the Court finds that this element is present in the NuGun device.

**said holder comprising in combination**

**an elongated barrel having an interior bore**

The Court finds that the NuGun ejector holder has an elongated barrel and an interior bore. (Tr. 92:10–24; PX–625 ¶ 7). Centrix does not dispute this. (Tr. 164:20–22). Accordingly, the Court finds that this element is present in the NuGun device.

**a plunger reciprocal therein and one end thereof projecting beyond said barrel**

The Court finds that inside the bore of the NuGun, there is a plunger which reciprocates within the bore. The Court further finds that one end of the plunger projects beyond the rearward end of the barrel. (Tr. 92:10–24; Tr. 93:21–94:8; PX–625, ¶ 7). Centrix does not dispute this. (Tr. 164:23–165:1; Tr. 165:6–8). Ac-

cordingly, the Court finds that this element is present in the NuGun device.

**manually operable lever means on one end of said barrel operable to reciprocate said plunger relative to the other end of said barrel**

The Court finds that the NuGun has a manually operable lever means positioned on one end of the barrel, that serves to reciprocate the plunger within the barrel by engaging the outer end of the plunger. (Tr. 94:2–11). The Court further finds that the lever means serves the identical function as the lever means disclosed in the '280 Patent, in that the lever means translates force to reciprocate the plunger within the barrel so that the composite material is extruded from the cartridge.

In arguing that the NuGun does not infringe the '280 Patent, Centrix contends that the lever means on the NuGun is not physically attached to the barrel. Rather, Centrix contends that the lever means on the NuGun is connected to the handle. Because the Court has construed this element of the claim as referring to the position of the lever means in relation to the barrel, rather than referring to a physical connection between the lever means and the barrel, the Court finds that the NuGun possesses this element of the claim. Further, in comparing the structure of the lever means in the NuGun to Figure 1 of, and disclosed in, the '280 Patent, the Court finds that the two are identical. The placement of the lever means in the NuGun device is no different than that presented in the preferred embodiment of the ejector holder shown in Figure 1. (See Figure 1, PX–623). Accordingly, the Court rejects Centrix's argument and finds that this element is present in the NuGun device.

**and said other end of the barrel being cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of said barrel**

The Court finds that the NuGun ejector holder is cutaway longitudinally a limited

distance to provide a compartment having sidewalls extending a limited distance beyond the axis of the barrel. (Tr. 95:14–96; PX–625, ¶ 10). Centrix does not dispute this. (Tr. 165:19–25). Accordingly, the Court finds that this element is present in the NuGun device.

**an undercut groove formed forward of said interior bore and rearwardly in said compartment within said sidewalls to receive the annular collar on said cartridge to prevent relative axial movement between said cartridge and compartment,**

The Court finds that an undercut groove is formed in the NuGun ejector holder forward of the interior bore and rearwardly in the compartment within the sidewalls. The Court further finds that when the Aelitefil or Centrix Accudose cartridge is inserted, the undercut groove receives the annular collar on the cartridge and prevents relative axial movement between the cartridge and the compartment. (Tr. 96:12–97:7; PX–625, ¶ 10).

In arguing that the NuGun does not infringe, Centrix contends that the NuGun does not have an undercut groove, but rather a shoulder. Centrix bases its argument on the assertion that a groove must have a rearward wall, a floor and a front wall, similar to a tongue and groove used in carpentry. (Tr. 166:6–14). Elaborating further, Centrix suggests that the undercut groove must prevent movement of the cartridge in a rearward direction.

As discussed in the context of claim interpretation, the Court rejects, as unsupportable by the patent and its preferred embodiment, Centrix's interpretation that a "groove" requires a rearward wall which stops movement in the rearward direction. Thus, the Court finds that the NuGun possesses an undercut groove, rather than a "shoulder" as described by Centrix. The Court's finding in this regard is further substantiated by Centrix's own evidence.

In a declaration submitted by Centrix's own patent attorney in support of its opposition to Dentsply's Show Cause Motion, Centrix's patent attorney opined that the NuGun possessed the undercut groove described in the patent. (Tr. 183:20–184:12; D.I. 314 at CA90). Accordingly, the Court finds that this element is present in the NuGun device.

**and the outer longitudinally-extending portions of the sidewalls of said compartment having limited flexibility and extending toward each other a slightly lesser distance than the diameter of said cartridge intermediate body portion to effect a snap-acting retaining means for the body of a cartridge when inserted into said compartment,**

The Court finds that the outer-longitudinally extending portions of the sidewalls of the compartment of the NuGun have limited flexibility and extend toward each other a slightly lesser distance than the diameter of the intermediate body portion of the cartridge to effect a snap-acting retaining means for the body of a cartridge. In reaching this finding, the Court accepts and credits the testimony of Mr. Scales concerning the measurements of the NuGun. According to Mr. Scales, the distance between the sidewalls of the NuGun was between 0.250 and 0.251″. The diameter of the Aelitefil cartridge was between 0.255 and 0.258″, and the diameter of the Centrix Accudose cartridge was between 0.256 and 0.262″. (Tr. 97:23–99:1, PX 625, ¶ 11 & Attachments at 1–4; PDX–3).

With regard to the flexibility requirement, the Court finds, based on Mr. Scales testimony, that the sidewalls of the NuGun have limited flexibility. Mr. Scales demonstrated the flexibility of the NuGun's sidewalls using a pin gauge.[13] First, Mr. Scales measured the distance between the upper ends of the sidewalls of the NuGun. Then, Mr. Scales repeatedly inserted a steel pin gauge having a diameter greater than the distance be-

---

13. A pin gauge is a device used to measure the diameter of orifices and chambers. They are constructed of stainless steel and calibrated to 1/1000 of an inch. (Tr. 100:9–17).

tween the upper sidewalls of the NuGun ejector into the compartment of the ejector. (Tr. 99:24–101:20). Afterward, Mr. Scales re-measured the sidewalls of the NuGun. In comparing the measurements taken before and after the insertion of the pin gauge, Mr. Scales noted that the measurements were unchanged. Mr. Scales further testified that this test indicated that the sidewalls have limited flexibility. (Tr. 102:4–7). Had the sidewalls lacked flexibility, as Centrix maintains, it either would have been impossible to insert the larger diameter steel pin, or if the pin could be inserted, the sidewalls would have been permanently deformed from the repeated straining caused by the insertion of the larger diameter pin gauge. (Tr. 102:4–15).

In response to Dentsply's evidence concerning the distance between the sidewalls in relation to the diameter of the cartridge and the limited flexibility of the NuGun sidewalls, Centrix offered the testimony of Dr. Dragan. Dr. Dragan testified that the NuGun does not infringe the '280 Patent, because (1) the side walls of the NuGun are "U-shaped," meaning if one extended the sidewalls in an upward direction, the walls would be parallel to each other, and (2) the NuGun does operates with a "press-fit" rather than a snap-acting retaining means. (Tr. 166:21–22). Elaborating further on the difference between a "snap-fit" and a "press-fit," Dr. Dragan described a "snap-fit" as a momentary area of "distortion of flexible side walls to allow the insertion of an object, such as a cartridge, after which the object is placed in the momentary flexure, is released and the side walls, the flexible side walls, close around it both longitudinally and circumferentially, to hold the capsule in place." (Tr. 175:19–24). In contrast, Dr. Dragan contends that a "press-fit" is a "forced friction fit, whereby one or both of the objects may be either compressed or distorted during the time that the object is in place." (Tr. 176:5–7). At the Court's request, Dr. Dragan inserted a cartridge into the NuGun to demonstrate his contention that the NuGun operates with a press-fit.

The Court finds Dr. Dragan's testimony unpersuasive. First, in demonstrating the retaining means used in the NuGun, it appeared to the Court, that Dr. Dragan had to manipulate the cartridge to avoid "snapping" it into place. While Centrix may have intended to design a device that utilized a press-fit, the Court finds that Dentsply's evidence clearly and convincingly shows that the NuGun operates with a snap-fit. Mr. Scales' measurements of the NuGun indicate that it functions with a snap-acting retaining means, because the sidewalls of the NuGun extend toward one another a slightly lesser distance than the cartridge and have limited flexibility, so that when a cartridge is inserted the side walls flex momentarily allowing the cartridge to be inserted and then release enclosing the cartridge and holding it into place. Centrix provided no empirical evidence supporting Dr. Dragan's testimony to the contrary. Thus, the Court finds Dr. Dragan's conclusory testimony to be unpersuasive.

Further, to the extent that Centrix contends that the cartridge is deforming when inserted, rather than the sidewalls of the NuGun flexing, the Court rejects Centrix's argument. First, the Court finds credible and persuasive Mr. Scales' testimony concerning the principles of an "open" and "closed" system, which led Mr. Scales to conclude that the NuGun's sidewalls are flexing, rather than the walls of the cartridge deforming, to allow the insertion of the cartridge. Mr. Scales explained that under stress dynamic principles, an open system, such as the horseshoe shape formed by the sidewalls of the NuGun, will flex under less force than a "closed" system like a cylindrical cartridge. (Tr. 106:1–3, 125:10–12). Second, the Court again notes that Centrix did not produce any empirical evidence to rebut Mr. Scales' testimony or measurements of the NuGun's sidewalls. The Court declines to credit Dr. Dragan's conclusory and empirically unsubstantiated testimony to the contrary.

Although Centrix did not offer evidence of its own measurements to rebut Dents-

ply's evidence offered by Mr. Scales, Centrix raises a number of challenges to Mr. Scales' credibility.[14] The Court, however, is unpersuaded by Centrix's arguments. First, Centrix fails to explain how many of its arguments affect the credibility of Mr. Scales' testimony. For example, Centrix contends that Mr. Scales did not measure a "sufficient statistical representation upon which to formulate a proper analysis." (D.I. 345 at 20). However, Centrix has not offered any evidence that there is variability among the NuGun devices making it necessary to measure a certain quantity of devices. Similarly, Centrix contends that Mr. Scales admitted that the pin gauge he used had a margin of error of one-one thousandth of an inch. However, Mr. Scales' testimony indicated that, even with this margin of error, the distance between the upper sidewalls of the NuGun compartment was less than the diameter of the cartridge. In other words, the difference in the dimensions of the distance between the sidewalls and the cartridge diameter exceeded one-one thousandth of an inch. Second, in independently observing Mr. Scales and reviewing his testimony, the Court finds that Mr. Scales was sufficiently knowledgeable regarding the subject matter of this lawsuit and sufficiently meticulous with his experiments and explanations to warrant the Court's finding that Mr. Scales was a credible witness who provided credible testimony and evidence.

Given the strength of Dentsply's evidence on this element of the claim and the lack of empirically substantiated evidence presented by Centrix in rebuttal, the Court find that this element of the claim is present in the NuGun device.

**said retaining means extending longitudinally a distance forward of said undercut groove substantially greater than the longitudinal length of said annular collar to hold a substantial portion of said cartridge intermediate body portion.**

The Court finds that the sidewall retaining means of the NuGun device extends a distance longitudinally forward of the undercut groove that is substantially greater than the longitudinal length of the annular cartridge on the cartridge. In reaching this conclusion, the Court again accepts and credits the unrebutted evidence provided by Mr. Scales concerning the measurements of the NuGun device. Mr. Scales' measurements indicate that the length of the sidewalls extending longitudinally forward of the undercut groove is approximately three times the length of the cartridge collar. (Tr: 106:5–107:25, PX–625, ¶ 12). Centrix has offered no evidence to the contrary regarding this element of the claim. Accordingly, the Court finds that the NuGun possesses this element of the claim.

In sum, the Court finds that every element of Claim 1 of the '280 Patent is present in the combination of the NuGun ejector holder and either the Aelitefil or the Accudose cartridges with which it is used. Therefore, the Court concludes that the combination of the NuGun and Aelitefil or Accudose cartridges literally infringes Claim 1 of the '280 Patent.

2. Whether the NuGun ejector holder meets every element of Claim 1 of the '853 Patent

After comparing the language of the Claim 1 of the '853 Patent with the NuGun ejector holder, the Court finds that Dentsply has shown by clear and convincing evidence that every element of Claim 1 of the '853 Patent is present in the NuGun device.

**A manually operable ejector holder**

The Court finds that the NuGun is a manually operable ejector holder. (Tr. 91:6–8; PX 625, ¶ 6). Centrix does not dispute this. (Tr. 164:7–10). Accordingly, the Court finds that this element is present in the NuGun device.

14. For additional discussion concerning Mr. Scales' credibility see *supra* Section II.B.2.

**for a capsule-like cartridge loaded with viscous material and the like**

The Court finds that the NuGun ejector holders are intended for use with loaded capsule-like cartridges, specifically the Centrix Accudose cartridges or the Aelitefil cartridges. The Aelitefil cartridges are sold loaded with a composite, viscous material, while the Centrix cartridges are sold unloaded and later filled by the dentist with a viscous material. (Tr. 91:9–19; PX 625, ¶ 6). Centrix does not dispute this. (Tr. 164:11–13). Accordingly, the Court finds that this element is present in the NuGun device.

**and having an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between**

The Court finds that both the Aelitefil and the Centrix Accudose cartridges have an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between. Centrix does not dispute this. (Tr. 164:14–17). Accordingly, the Court finds that this element is present in the NuGun device.

**said holder comprising in combination**

**an elongated barrel having forward and rearward ends and also having an interior bore**

The Court finds that the NuGun ejector holder has an elongated barrel with forward and rearward ends and an interior bore. (Tr. 92:10–24; PX–625, ¶ 7). Centrix does not dispute this. (Tr. 164:20–22). Accordingly, the Court finds that this element is present in the NuGun device.

**a plunger reciprocal therein and one end thereof projecting beyond said rearward end of said barrel,**

The Court finds that inside the bore of the NuGun, there is a plunger which reciprocates within the bore. One end of the plunger projects beyond the rearward end of the barrel. (Tr. 92:10–24; Tr. 93:21–94:8; PX–625, ¶ 7). Centrix does not dis-

pute this. (Tr. 164:23–165:1; Tr. 165:6–8). Accordingly, the Court finds that this element is present in the NuGun device.

**a handle connected to said rearward end of said barrel and extending substantially transversely to the axis thereof,**

The Court finds that the handle of the NuGun is connected to the rearward end of the barrel of the NuGun ejector holder. The Court further finds that the handle extends substantially transversely to the axis of the ejector holder. (Tr. 94:13–95; PX–625, ¶ 8). Centrix is silent regarding this element of the claim and has not raised a dispute concerning its application to the NuGun. Accordingly, the Court finds that this element is present in the NuGun device.

**a lever manually operable relative to said handle and barrel to reciprocate said plunger relative to the other end of said barrel for engagement with a capsule when disposed therein,**

The Court finds that the NuGun has a lever manually operable relative to the handle and barrel that reciprocates the plunger relative to the other end of the barrel for engagement with a cartridge when loaded in the ejector holder. (Tr. 94:2–95:3; PX–625, ¶ 8). To the extent that Centrix's argument concerning the connection of the lever means applies to this element, the Court rejects it for the reasons discussed in its analysis of the lever means element of Claim 1 of the '280 Patent. In addition, the Court further finds that the placement of the lever means in the NuGun device is no different than in the preferred embodiment of the ejector holder shown in Figure 1 of the '853 Patent. (See Figure 1, PX–624). Accordingly, the Court finds that this element is present in the NuGun device.

**and said other end of the barrel being cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of said barrel**

The Court finds that the other end, meaning the front end, of the NuGun ejec-

tor holder is cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of the barrel. (Tr. 95:14–96; PX–625, ¶ 10). Centrix does not dispute this. (Tr. 165:19–25). Accordingly, the Court finds that this element is present in the NuGun device.

**an undercut groove formed forward of said interior bore and rearwardly in said compartment within said sidewalls to receive the annular collar on said cartridge to prevent relative axial movement between said cartridge and compartment,**

The Court finds that an undercut groove is formed in the NuGun ejector holder forward of the interior bore and rearwardly in the compartment within the side walls. The Court further finds that when the Aelitefil or Centrix Accudose cartridges is inserted, the undercut groove receives the annular collar on the cartridge and prevents relative axial movement between the cartridge and the compartment. (Tr. 96:12–97:7; PX–625, ¶ 10). For the reasons discussed previously in the context of the undercut groove element of Claim 1 of the '280 Patent, the Court rejects Centrix's argument that the NuGun possesses a "shoulder," rather than an undercut groove. Accordingly, the Court finds that this element is present in the NuGun device.

**and the outer longitudinally-extending portions of the sidewalls of said compartment having limited flexibility and extending toward each other a slightly lesser distance than the diameter of said cartridge intermediate body portion to effect a snap-acting retaining means for the body of a cartridge when inserted into said compartment**

The Court finds that the outer-longitudinally extending portions of the sidewalls of the compartment of the NuGun have limited flexibility and extend toward each other a slightly lesser distance than the diameter of the intermediate body portion of the cartridge to effect a snap-acting retaining

means for the body of a cartridge. The Court further finds that the sidewalls of the NuGun have limited flexibility. As discussed in the context of Claim 1 of the '280 Patent, the Court accepts and credits the testimony of Mr. Scales concerning the measurements of the NuGun and the flexibility of its sidewalls, and rejects Centrix's arguments discrediting Mr. Scales. Centrix has offered no evidence, other than the conclusory and empirically unsubstantiated testimony of Dr. Dragan, concerning the distance between the NuGun sidewalls and the flexibility of the sidewalls to contradict or rebut Mr. Scales' testimony. Accordingly, the Court finds that this element is present in the NuGun device.

**said retaining means extending longitudinally a distance forward of said undercut groove substantially greater than the longitudinal length of said annular collar to hold a substantial portion of said cartridge intermediate body portion.**

The Court finds that the sidewall retaining means of the NuGun device extends a distance longitudinally forward of the undercut groove that is substantially greater than the longitudinal length of the annular cartridge on the cartridge. In reaching this conclusion, the Court again accepts and credits the unrebutted evidence provided by Mr. Scales concerning the measurements of the NuGun device, as discussed in the context of Claim 1 of the '280 Patent. Mr. Scales' measurements indicate that the length of the sidewalls extending longitudinally forward of the undercut groove is approximately three times the length of the cartridge collar. (Tr: 106:5–107:25, PX–625, ¶ 12). Centrix has offered no evidence to the contrary regarding this element. Accordingly, the Court finds that this element is present in the NuGun device.

In sum, the Court finds that every element of Claim 1 of the '853 Patent is literally found in the NuGun ejector holder. Therefore, the Court concludes that

the NuGun ejector holder literally infringes Claim 1 of the '853 Patent.

3. Whether the combination of the Centrix–Manufactured Vivadent ejector holders and the Vivadent cartridges meets every element of Claim 1 of the '280 Patent

After comparing the language of Claim 1 of the '280 Patent with the combination of the Centrix-manufactured Vivadent ejector holder and the Vivadent cartridge, the Court finds that Dentsply has established by clear and convincing evidence that every element recited in Claim 1 of Dentsply's '280 Patent is present in the Vivadent device.

**A manually operable ejector holder**

The Court finds that the Vivadent syringe is a manually operable ejector holder. (Tr: 110:17–19; PX–617; PDX–2; PX–627, ¶ 5). Centrix does not contest this. Accordingly, the Court finds that this element of the claim is present in the Vivadent device.

**and a loaded capsule-like cartridge**

The Court finds that the Vivadent ejector holder is intended for use with a loaded capsule-like cartridge. Specifically, the Court finds that the Vivadent ejector holder is intended for use with Vivadent Cavifil cartridges loaded with Tetric composite material. (Tr. 110:20–23; PX–627, ¶ 5). Centrix does not contest this.[15] Accordingly, the Court finds that this element is present in the Vivadent device.

**in which said cartridge has an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between**

The Court finds that the Vivadent Cavifil cartridges have an annular collar on one

end, a discharge tip on the other, and an intermediate body portion in between. (Tr. 110:24–111:7; PX–627. ¶ 5). Centrix does not contest this. Accordingly, the Court concludes that the Vivadent cartridge possesses this element of the claim.

**said holder comprising in combination**

**an elongated barrel having an interior bore**

The Court finds that the Vivadent ejector holder has an elongated barrel having an interior bore. (Tr. 111:8–11, PX–627, ¶ 6). Centrix does not contest this. Accordingly, the Court concludes that the Vivadent ejector holder possesses this element of the claim.

**a plunger reciprocal therein and one end thereof projecting beyond said barrel,**

The Court finds that inside the bore of the Vivadent ejector holder, there is a plunger which reciprocates within the bore. The Court further finds that one end of the plunger projects beyond the rearward end of the barrel. (Tr. 111:22–112:6; PX–627, ¶ 6). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**manually operable lever means on one end of said barrel operable to reciprocate said plunger relative to the other end of said barrel,**

The Court finds that the Vivadent ejector holder has a manually operable lever means positioned on one end of the barrel

---

**15.** In the context of discussing whether the differences between the devices were merely colorable for purposes of determining the propriety of contempt proceedings, Centrix contended that the Vivadent cartridge is substantially different from the accused Kerr cartridge, because the Vivadent cartridge has an extended plunger which prevents the Vivadent cartridge from being interchangeable or usable in the Kerr devices. To the extent that Centrix's argument can be applied to the infringement context, the Court rejects Centrix's contention. In accord with the plain language of the claims, the Court finds that neither this element nor any other elements of the patents mandate interchangeability of cartridges. Accordingly, the Court concludes that Centrix's argument is irrelevant to the infringement analysis. ·

that serves to reciprocate the plunger within the barrel. The Court further finds that the lever means of the Vivadent ejector holder serves the identical function as the lever means disclosed in the '280 Patent, in that the lever means translates force applied to the lever to reciprocate the plunger within the barrel so that the composite material in the cartridge is extruded. (Tr. 112:13–21; PX–627, ¶¶ 7, 8).

In arguing that the Vivadent ejector holder does not infringe the '280 Patent, Centrix contends that "it is obvious from inspection," that the Vivadent device does not have a manually operated lever means on one end of the barrel. (D.I. 347 at 19). The Court disagrees with Centrix's assertion. To the contrary, the Court finds that the structure of the lever means in the Vivadent ejector holder is identical to the structure illustrated in Figure 1 and disclosed in the '280 Patent. Accordingly, the Court finds that this element is present in the Vivadent device.

**and said other end of the barrel being cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of said barrel,**

The Court finds that the front end of the barrel of the Vivadent ejector holder is cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of the barrel. (Tr. 112:2–113:6; PX–627, ¶ 9). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**an undercut groove formed forward of said interior bore and rearwardly in said compartment within said sidewalls to receive the annular collar on said cartridge to prevent relative axial movement between said cartridge and compartment**

The Court finds that an undercut groove is formed in the Vivadent ejector holder forward of the interior bore and rearwardly in the compartment within the sidewalls.

The Court further finds that when the Vivadent Cavifil cartridge is inserted into the compartment, the undercut groove receives the annular collar on the cartridge and prevents relative axial movement between the cartridge and the compartment. (Tr. 112:13–21; PX–627, ¶ 7–8).

In arguing that the Vivadent ejector holder does not meet this element of the claim, Centrix contends that the Vivadent ejector holder does not have an undercut groove. Rather, Centrix contends that the Vivadent device has a "sharp shoulder which delineates the forward compartment from the bore of the barrel that receives the pusher." (D.I. 347 at 19). The Court rejects Centrix's argument. In comparing the Vivadent ejector holder to the infringing Kerr device, the Court finds that the configuration of the Vivadent ejector holder is essentially identical to the infringing Kerr Unidose device. (PX–617, PX–522, PX–500; Tr. 113:15–24). Accordingly, the Court finds that the Vivadent ejector holder literally possesses the undercut groove required by this element of the claim.

**and the outer longitudinally-extending portions of the sidewalls of said compartment having limited flexibility and extending toward each other a slightly lesser distance than the diameter of said cartridge intermediate body portion to effect a snap-acting retaining means for said cartridge when inserted into said compartment,**

The Court finds that the outer-longitudinally extending portions of the sidewalls of the compartment of the Vivadent ejector holder have limited flexibility and extend toward each other a slightly lesser distance than the diameter of the intermediate body portion of the cartridge to effect a snap-acting retaining means for the body of the cartridge. In reaching this finding, the Court accepts and credits the testimony of Mr. Scales concerning the measurements of the Vivadent device. According to Mr. Scales, the distance between the sidewalls of the Vivadent device was between 0.267 and 0.268″, and the diameter

of the Vivadent Cavifil cartridge was 0.294". (Tr. 114:13–115:15; PX–627, ¶ 10 & Attachment at 2, 5; PDX–3). Thus, the outer-longitudinally extending portions of the sidewalls extend toward each other a slightly lesser distance than the diameter of the intermediate body portion of the cartridge. (Tr. 114:17–21). Further, utilizing the same pin gauge technique described previously, Mr. Scales concluded that the sidewalls of the Vivadent device have limited flexibility. (Tr. 116:3–19).

Based on Mr. Scales' measurements, the Court also finds that the Vivadent device functions with a snap-acting retaining means. Because the distance between the upper edges of the sidewalls is less than the diameter of the cartridge and the walls curve in slightly to help retain the cartridge, the Vivadent ejector holder utilizes a snap-fit. (Tr. 102:16–103:8, 114:13–115:15, 116:20–117:2).

Centrix has not offered any testimony or evidence to rebut Mr. Scales' findings and conclusions concerning the Vivadent ejector holder and Vivadent Cavifil cartridge. Further, Centrix has not contested that the Vivadent device functions with a snap-acting retaining means. To the extent that Centrix's argument concerning the credibility of Mr. Scales can be applied to his analysis of the Vivadent syringe, the Court rejects Centrix's arguments for the reasons set forth previously. Accordingly, the Court finds that this element is present in the Vivadent device.

**said retaining means extending longitudinally a distance forward of said undercut groove substantially greater than the longitudinal length of said annular collar to hold a substantial portion of said cartridge intermediate body portion.**

The Court finds that the sidewall retaining means of the Vivadent device extends a distance longitudinally forward of the undercut groove that is substantially greater than the longitudinal length of the annular collar on the cartridge. In making this finding, the Court again accepts and credits the unrebutted evidence provided by Mr. Scales concerning the measurements of the Vivadent device. Mr. Scales' measurements indicate that the length of the sidewalls extending longitudinally forward of the undercut groove is approximately three times the length of the cartridge collar. (Tr. 117:4–17; PX–627, ¶ 11). Centrix has not offered any evidence to rebut Mr. Scales' findings and conclusions, and with the exception of the undercut groove argument addressed previously, Centrix does not contest that the Vivadent device satisfies this element of the claim. Accordingly, the Court finds that this element is present in the Vivadent device.

In sum, the Court finds that every element of Claim 1 of the '280 Patent is present in the combination of the Vivadent ejector holder and the Cavifil cartridge. Therefore, the Court concludes that the combination of the Vivadent ejector holder and Cavifil cartridge literally infringe Claim 1 of the '280 Patent.

4. Whether the Centrix–Manufactured Vivadent ejector holder meets every element of Claim 1 of the '853 Patent

After comparing the language of Claim 1 of the '853 Patent with the Vivadent ejector holder, the Court finds that Dentsply has established by clear and convincing evidence that every element of Claim 1 of the '853 Patent is present in the Vivadent device.

**A manually operable ejector holder**

The Court finds that the Vivadent syringe is a manually operable ejector holder. (Tr. 110:17–19; PX–617; PDX–2; PX–627, ¶ 5). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**for a capsule-like cartridge loaded with viscous material and the like**

The Court finds that the Vivadent ejector holder is intended for use with a loaded

capsule-like cartridge. Specifically, the Court finds that the Vivadent ejector holder is intended for use with Vivadent Cavifil cartridges loaded with Tetric composite material. (Tr. 110:20–23; PX–627, ¶ 5). To the extent that Centrix argues that this element of the claim is not found in the Vivadent device because the Vivadent cartridge is not interchangeable, the Court rejects Centrix's argument for the reasons discussed previously. Accordingly, the Court finds that the Vivadent device possesses this element of the claim.

**and having an annular collar on one end, a discharge tip on the other end, and an intermediate body portion in between**

The Court finds that the Vivadent Cavifil cartridges have an annular collar on one end, a discharge tip on the other, and an intermediate body portion in between. (Tr. 110:24–111:7; PX–627, ¶ 5). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**said holder comprising in combination**

**an elongated barrel having forward and rearward ends and also having an interior bore**

The Court finds that the Vivadent ejector holder has an elongated barrel having an interior bore. (Tr. 111:8–11, PX–627, ¶ 6). Centrix does not contest this. Accordingly, the Court concludes that this element is present in the Vivadent device.

**a plunger reciprocal therein and one end thereof projecting beyond said rearward end of said barrel,**

The Court finds that inside the bore of the Vivadent ejector holder, there is a plunger which reciprocates within the bore. The Court further finds that one end of the plunger projects beyond the rearward end of the barrel. (Tr. 111:22–112:6, PX–627, ¶ 6). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**a handle connected to said rearward end of said barrel and extending substantially transversely to the axis thereof,**

The Court finds that the handle of the Vivadent ejector holder is connected to the rearward end of the barrel of the Vivadent ejector holder. The Court further finds that the handle extends substantially transversely to the axis of the ejector holder. (Tr. 112:7–12, PX–627, ¶ 7). Centrix does not contest this. Accordingly, the Court finds that this element is present in the Vivadent device.

**a lever manually operable relative to said handle and barrel to reciprocate said plunger relative to the other end of said barrel engagement with a capsule when disposed therein,**

The Court finds that the Vivadent ejector holder has a lever manually operable relative to the handle and barrel that reciprocates the plunger relative to the other end of the barrel for engagement with a cartridge when loaded in the ejector holder. (Tr. 112:13–21; PX–627, ¶¶ 7–8). To the extent that Centrix's argument that the Vivadent device does not have a manually operated lever means on one end of the barrel applies to this element, the Court rejects it for the reasons discussed previously in the context of the '280 Patent (D.I. 347 at 19). Accordingly, the Court finds that this element is present in the Vivadent device.

**and said other end of the barrel being cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of said barrel,**

The Court finds that the front end of the barrel of the Vivadent ejector holder is cutaway longitudinally a limited distance to provide a compartment having sidewalls extending a limited distance beyond the axis of the barrel. (Tr. 112:2–113:6; PX–627, ¶ 9). Centrix does not contest this.

Accordingly, the Court finds that this element is present in the Vivadent device.

**an undercut groove formed forward of said interior bore and rearwardly in said compartment within said sidewalls to receive the annular collar on a cartridge to prevent relative axial movement between said cartridge and said compartment,**

The Court finds that an undercut groove is formed in the Vivadent ejector holder forward of the interior bore and rearwardly in the compartment within the sidewalls. The Court further finds that when the Vivadent Cavifil cartridges are inserted, the undercut groove receives the annular collar on the cartridge and prevents relative axial movement between the cartridge and the compartment. (Tr. 113:7–114:12; PX–627, ¶ 9). For the reasons discussed in the context of the '280 Patent, the Court rejects Centrix's argument that the Vivadent ejector holder possesses a shoulder, rather than an undercut groove. Accordingly, the Court finds that this element is present in the Vivadent device.

**and the outer longitudinally-extending portions of the sidewalls of said compartment having limited flexibility and extending toward each other a slightly lesser distance than the diameter of said cartridge intermediate body portion to effect a snap-acting retaining means for the body of a cartridge when inserted into said compartment,**

The Court finds that the outer-longitudinally extending portions of the sidewalls of the compartment of the Vivadent ejector holder have limited flexibility and extend toward each other a slightly lesser distance than the diameter of the intermediate body portion of the cartridge to effect a snap-acting retaining means for the body of the cartridge. As discussed in the context of Claim 1 of the '280 Patent, the Court accepts and credits the testimony of Mr. Scales concerning the measurements of the Vivadent ejector holder and cartridge and the flexibility of the sidewalls of the Vivadent ejector holder. (Tr. 114:13–

115:15; PX–627, ¶ 10 at Attachment 2 & 5; PDX–3). Further, as discussed previously, the Court rejects Centrix's arguments discrediting Mr. Scales. Accordingly, the Court finds that this element is present in the Vivadent device.

**said retaining means extending longitudinally a distance forward of said undercut groove substantially greater than the longitudinal length of said annular collar to hold a substantial portion of said cartridge intermediate body portion.**

The Court finds that the sidewall retaining means of the Vivadent device extends a distance longitudinally forward of the undercut groove that is substantially greater than the longitudinal length of the annular collar on the cartridge. In making this finding, the Court again accepts and credits the unrebutted evidence provided by Mr. Scales concerning the measurements of the Vivadent device. Mr. Scales' measurements indicate that the length of the sidewalls extending longitudinally forward of the undercut groove is approximately three times the length of the cartridge collar. (Tr. 117:4–17; PX–627, ¶ 11). Centrix has not offered any evidence to rebut Mr. Scales' findings and conclusions, and with the exception of the undercut groove argument addressed and rejected previously by the Court, Centrix does not contest that the Vivadent device satisfies this element of the claim. Accordingly, the Court finds that this element is present in the Vivadent device.

In sum, the Court finds that every element of Claim 1 of the '853 Patent is present in the Vivadent ejector holder. Therefore, the Court concludes that the Vivadent ejector holder literally infringes Claim 1 of the '853 Patent.

## IV. Whether Dentsply Is Issue Precluded From Asserting Infringement of the '280 and '853 Patents Against Centrix

Centrix argues that Dentsply is issue precluded from asserting infringement of

the '280 and '853 Patents against Centrix, because the inventions claimed in the Patents were allegedly not developed by Dentsply.[16] Centrix further contends that a finding that Dentsply did not develop the invention "is tantamount to finding the '280 and '853 Patents invalid as between the parties." (D.I. 345 at 38).

■ Dentsply contests Centrix's assertion that it did not develop the inventions claimed in the '280 and '853 Patents. However, even if Centrix's assertion were true, the Court finds Centrix's argument to be irrelevant to the instant contempt proceedings. In a contempt proceeding, a charge of infringement may not be challenged on the basis that the patent is invalid. Therefore the Court concludes that the validity of the '280 and '853 Patents is the law of the case for purposes of the instant contempt proceedings. *KSM,* 776 F.2d at 1529. Accordingly, the Court rejects Centrix's argument that Dentsply is issue precluded from asserting the '280 and '853 Patents.

### CONCLUSION

For the reasons discussed, the Court finds Centrix in contempt for violating this Court's injunction dated January 27, 1993. The Court will hold an accounting for the purposes of determining the damages owed to Dentsply by Centrix.

### *MEMORANDUM OPINION*

FARNAN, Chief Judge.

Presently before the Court is a Motion For Reargument And/Or Reconsideration Of The Court's Order Of March 11, 1999, Finding Centrix, Inc. In Contempt Of The Court's Injunction Order Of June 27, 1993 (D.I.353), and an application for oral argu-

ment on the Motion (D.I.360) filed by Centrix, Inc. ("Centrix"). Briefing has been completed on the Motion, and the Court finds that, based on the nature of the arguments presented and the extensive record in this case, oral argument is not necessary. Accordingly, the Court will consider the Motion on the basis of the papers filed, including the pleadings of record in this case. For the reasons set forth below, the Court will deny the Motion.

### BACKGROUND

Following an evidentiary hearing and full post-hearing briefing on a Motion For Order To Show Cause Why Centrix, Inc. Should Not Be Held In Contempt Of This Court's June 27, 1993 Injunction Order (D.I.304) (the "Show Cause Motion") filed by Dentsply International, Inc. and Dentsply Research and Development Corp. (collectively "Dentsply"), the Court issued an Opinion and Order dated March 11, 1999 (D.I.351, 352) (the "March 11 Opinion and Order") concluding that Centrix should be held in contempt of the June 27, 1993 Injunction Order (the "1993 Injunction"). Among other things, the Court specifically concluded that: (1) Centrix was in privity with Kerr Manufacturing Company ("Kerr"), the defendant in the Dentsply–Kerr litigation[1]; (2) contempt proceedings were appropriate for resolution of the dispute between Dentsply and Centrix, and (3) Centrix violated the Court's 1993 Injunction, because its Vivadent and NuGun devices literally infringed two Dentsply patents: United States Patent Nos. 4,330,-280 (the " '280 Patent") and 4,384,853 (the " '853 Patent"). Shortly thereafter, Centrix filed the instant Motion seeking reargument and/or reconsideration of the Court's March 11 Opinion and Order.

---

**16.** In its pre-hearing briefs, Centrix raised arguments under the theories of laches, mootness, prosecution history estoppel and intervening rights. However, Centrix did not pursue these arguments at the hearing or in its post-hearing briefs. Therefore, the Court considers these arguments abandoned by Centrix.

**1.** Additional factual background concerning the Dentsply–Kerr litigation and the instant dispute between Centrix and Dentsply is set forth fully in the Court's March 11 Opinion.

## DISCUSSION

### I. Legal Standard for Reargument

Although not explicitly provided for in the Federal Rules of Civil Procedure, Local Rule 7.1.5 provides for the filing of reargument motions.[2] *See* D.Del. L.R. 7.1.5. Such motions should only be granted sparingly and should not be used to rehash arguments already briefed or to allow a "never-ending polemic between the litigants and the Court." *Oglesby v. Penn Mutual Life Ins. Co.*, 877 F.Supp. 872, 892 (D.Del.1995). Further, "reargument should never be granted if reargument would not alter the previous results reached by the Court." *Stairmaster Sports/Medical Products, Inc. v. Groupe Procycle, Inc.*, 25 F.Supp.2d 270, 292–293 (D.Del.1998). However, the court, in its discretion, may grant reargument in three circumstances: (1) where the court has patently misunderstood a party, (2) where the court has made an error not of reasoning, but of apprehension, or (3) where the court has made a decision outside the scope of the issues presented to the court by the parties. *Pirelli Cable Corp. v. Ciena Corp.*, 988 F.Supp. 424, 445 (D.Del. 1998) (citations omitted). With this standard in mind, the Court will address the grounds raised by Centrix for reargument of the Court's March 11 Opinion and Order.

### II. Centrix's Grounds For Reargument

By its Motion, Centrix raises four grounds for reargument and/or reconsideration. First, Centrix contends that the Court patently misunderstood its claims concerning the Vivadent and NuGun devices. Second, Centrix contends that it did not intend to abandon certain defenses it raised in its pre-hearing briefs on the Show Cause Motion. Third, Centrix contends that "new facts" may make the Court's holding regarding the Vivadent device moot. Lastly, Centrix contends that the Court's holding that Centrix was in privity with Kerr is erroneous. The Court will address each of Centrix's arguments in turn.

### A. *The Vivadent and NuGun Devices*

Centrix contends that reargument is appropriate because the Court patently misunderstood Centrix's claims concerning the Vivadent device and the NuGun device. With respect to the Vivadent device, Centrix contends that the Vivadent device lacks an undercut groove as required by the patents in issue. In this regard, Centrix contends that the Vivadent device does not have the "slope or slant feature" that the Kerr device does, but rather a "sharp 90˝angle." (D.I. 354 at 12). Further, Centrix emphasizes that the jury in the Dentsply–Kerr action found that the Kerr device had a feature which it found to be the equivalent of an undercut groove, rather than a feature that was literally an undercut groove.

The Court rejects Centrix's argument that the Court patently misunderstood its claim concerning the lack of an undercut groove in the Vivadent device. In its pre- and post-hearing briefing on the Motion To Show Cause, Centrix argued that the Vivadent gun had a "shoulder" rather than an undercut groove. The Court considered this argument and rejected it. (D.I. 351 at 75–76). The Court's findings regarding the presence of an undercut groove in the Vivadent device and its finding that the Kerr and Vivadent devices were essentially identical were not the result of any misapprehension of Centrix's position, but rather, were the result of the Court's analysis of the testimony

---

2. Local Rule 7.1.5 provides:

 A motion for reargument shall be served and filed within 10 days after the filing of the Court's opinion or decision. The motion shall briefly and distinctly state the grounds therefor. Within 10 days after ser-vice of such motion, the opposing party may serve and file a brief answer to each ground asserted in the motion. The Court will determine from the motion and answer whether reargument will be granted.

and evidence presented by the parties. Accordingly, the Court rejects Centrix's contention that reargument is appropriate, because the Court misapprehended Centrix's position regarding the Vivadent device.

Further, the Court rejects Centrix's argument that the jury's finding that the Kerr device possessed the equivalent of an undercut groove should impact the Court's findings and conclusions regarding the Vivadent device. Dentsply presented evidence both in its briefing and at the hearing that the Vivadent device literally possessed an "undercut groove," and the Court found this evidence persuasive. In any event, even if the Court were to reconsider its position regarding literal infringement, the Court still found the Vivadent device to be "virtually identical" to the Kerr device, which was previously determined to infringe the patents in issue. Accordingly, the Court concludes that reargument would not alter the Court's conclusion that the Vivadent device infringes the patents, and therefore, reargument on this issue is inappropriate. *See Stairmaster*, 25 F.Supp.2d at 292–293.

Likewise, with respect to Centrix's contention that the Court misunderstood its arguments concerning the NuGun device, the Court rejects Centrix's arguments. By its Motion, Centrix reiterates its position that the NuGun has a press fit, rather than a snap-fit. The Court both considered Centrix's argument and rejected it. (D.I. at 58–61). In this regard, the Court evaluated the witnesses before it and credited the testimony of Dentsply's witness, Mr. Scales. The Court rejected Dr. Dragan's testimony concerning the presence of a press fit in the NuGun device based on the Court's observations during the hearing and the Court's finding that his testimony was not empirically supported. (D.I.61, 62). As such, the Court's findings and conclusions were not based on a misunderstanding of Centrix's position, but on the Court's evaluation and analysis of the evidence before it. Accordingly, the Court rejects Centrix's contention that reargument is needed because the Court patently misunderstood its position regarding the NuGun device.

### B. Centrix's Claims of Latches, Mootness, Prosecution History Estoppel and Intervening Rights

Centrix next contends that it did not intend to abandon its claim of latches, mootness, prosecution history estoppel and intervening rights. In this regard, Centrix contends that Dentsply is precluded by "file wrapper estoppel" from interpreting the scope of Claim 1 of the reexamined '280 Patent and the '853 Patent to cover a syringe construction operating with a press fit. Centrix also contends that it did not have sufficient time at the hearing to present its arguments on these theories. Nevertheless, Centrix admits that these issues are "collateral issues not directly related to whether or not Centrix is in contempt of the Court's injunction order." (D.I. 354 at 30).

While the Court acknowledges that it imposed a three hour time limit per side at the evidentiary hearing on the Motion To Show Cause, Centrix did not even refer to its alleged arguments under the theories of laches, mootness, prosecution history estoppel or intervening rights during the hearing. While Centrix briefed its argument concerning issue preclusion in its post-hearing submissions, Centrix did not address, raise or preserve its arguments under the other theories. In these circumstances, the Court's concludes that its determination that Centrix abandoned these arguments was appropriate.[3]

---

**3.** As the transcript for the hearing indicates, there was ample time for Centrix to present these issues, if it so desired. Further, Centrix could have presented these issues in its post-hearing briefing, but instead, chose to address other issues. Given the opportunities Centrix had to present these arguments and its failure to do so, the Court concludes that it appropriately determined that Centrix abandoned these issues.

However, even if the Court were to find that Centrix did not abandon these arguments, the Court finds these arguments insufficient to merit reconsideration or reargument. First, Centrix has not explained what its position is concerning these arguments.[4] Second, Centrix admits that they are collateral issues. Accordingly, the Court finds that they could not alter the previous results reached by the Court. Therefore, the Court concludes that these arguments provide no basis for reargument or reconsideration of the Court's March 11 Opinion and Order.

## C. New Facts Concerning the Vivadent Device

In its third ground for reconsideration, Centrix contends that "new facts" may make the Vivadent holding moot. Specifically, Centrix contends that Dentsply and Vivadent[5] entered into a Settlement Agreement in which Vivadent would pay Dentsply a lump sum of 29,000 British pounds in exchange for a release from any claims Dentsply may have against Vivadent.

In its Opposition To Centrix's Motion (D.I.359), Dentsply points out that its settlement with Vivadent relates to one of Dentsply's European patents. (D.I. 355 at RA28). Accordingly, Dentsply contends that this settlement has no bearing on whether Centrix was properly held in contempt of the 1993 Injunction relating to Dentsply's United States patents. However, Dentsply suggests that Centrix could argue during the accounting phase of this proceeding that Dentsply has already been compensated for infringement by the Vivadent device as a result of Dentsply's settlement with Vivadent.

The Court agrees with Dentsply. Centrix has failed to point out how this settlement, concerning a European patent, affects the Court's holdings that Centrix is liable for violating the 1993 Injunction. The Court further concludes that any issues raised by the Dentsply–Vivadent settlement are more pertinent to the question of what damages, if any, are owed to Dentsply. Therefore, the Court finds that this issue is more appropriately addressed in the context of the accounting phase of this proceeding. Accordingly, the Court rejects Centrix's argument that the settlement between Dentsply and Vivadent warrants reargument or reconsideration of the Court's March 11 Opinion and Order.

## D. Privity Issue

Lastly, Centrix seeks reargument and/or reconsideration on the ground that "Centrix was not in privity with Kerr, in the sense that it acted as Kerr's 'virtual representative.'" (D.I. 354 at 31). In this regard, Centrix directs the Court to additional documents, not originally presented by Centrix in connection with the Show Cause Motion. In addition, Centrix contends that the only evidence concerning the critical period for a privity determination came in the form of the differing views of Mr. Tomassi and Dr. Dragan, and that such "he says—she says" evidence does not amount to the clear and convinc-

---

4. The Court does acknowledge that Centrix provided some explanation concerning its argument of "file wrapper estoppel" in its Motion for reargument. (D.I. 354 at 29). In particular, Centrix contends that, at the Dentsply–Kerr trial, evidence was produced establishing that Dentsply cannot interpret the scope of Claim 1 of the reexamined '280 and '853 Patents to cover a syringe construction operating with a press fit. The Court, however, has already rejected Centrix's press fit arguments in its March 11 Opinion and

again in this Memorandum Opinion. Because Centrix's argument of "file wrapper estoppel" would not alter the results already reached by the Court, the Court declines to grant reargument and/or reconsideration on this basis.

5. Vivadent–Ivoclar is a European corporation headquartered in Liechtenstein, and the same entity to whom Centrix sold the Vivadent and NuGun devices.

ing evidence required to make a privity determination. (D.I. 354 at 33).

 The Court rejects Centrix's argument for several reasons. First, newly discovered evidence may only serve as a basis for reargument if it were "truly unobtainable" at the time of the proceedings. *Schering Corporation v. Amgen, Inc.*, 25 F.Supp.2d 293, 298–99 (D.Del. 1998) (rejecting as newly discovered evidence, evidence that was obtainable by exercise of due diligence prior to Markman hearing). In its Appendix, Centrix contends that these documents were "not readily available" because "the relevant happening occurred almost ten years prior to the hearing." (D.I. 355 at RA173). However, it appears that all of these documents were either originally addressed or copied to Centrix or its counsel, and that some of these documents were even referred to by witnesses during the hearing. (Tr. of 12/20/96 Hearing at 39–40). Accordingly, the Court concludes that these documents were "not truly unobtainable," such that they can be considered newly discovered evidence requiring reconsideration or reargument of the Court's March 11 Opinion and Order.

Second, the Court rejects Centrix's assertion that "he says—she says" evidence cannot amount to clear and convincing evidence. During the hearing, the Court had the opportunity to hear the testimony of and evaluate the credibility of the witnesses on the privity issue. Based on its observations, the Court expressly credited the testimony of Mr. Tomassi. However, the Court did not rely on Mr. Tomassi's testimony alone. Rather, the Court found his testimony to be corroborated by other record evidence. Lastly, the Court finds Centrix's arguments to be directed more at an alleged error of reasoning by the Court than an error based on the Court's misapprehension or misunderstanding. Accordingly, the Court will deny Centrix's request for reargument and/or reconsideration of the privity issue.

## CONCLUSION

For the reasons discussed, Centrix's Motion For Reargument And/Or Reconsideration Of The Court's Order Of March 11, 1999, Finding Centrix, Inc. In Contempt Of The Court's Injunction Order Of June 27, 1993 (D.I.353), and its application for oral argument on the motion (D.I.360) will be denied. Lastly, the Court will hold a hearing on the accounting issues on either Wednesday, June 9, 1999 or Thursday, June 10, 1999. The parties should confer and advise the Court which date they prefer no later than Monday, May 10, 1999.

An appropriate Order will be entered.

## *ORDER*

At Wilmington this 29 day of April 1999, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Centrix, Inc.'s Motion For Reargument And/Or Reconsideration Of The Court's Order Of March 11, 1999, Finding Centrix, Inc. In Contempt Of The Court's Injunction Order Of June 27, 1993 (D.I. 353) is DENIED.

2. Centrix, Inc.'s Application For Oral Hearing On Centrix, Inc.'s Motion For Reargument is DENIED.

3. The parties shall confer and inform the Court no later than Monday, May 10, 1999 with respect to their preference for a Wednesday, June 9, 1999 or Thursday, June 10, 1999 accounting hearing.